# Exhibit 1

# REGISTER OF ACTIONS
## CASE NO. 1JC-18-1964

| JOSEPH HALL VS SOUTHWEST AIRLINES | § | Case Type: | **Small Claims** |
|---|---|---|---|
| | § | Date Filed: | **11/09/2018** |
| | § | Location: | **JP1** |
| | § | | |
| | § | | |

---

### PARTY INFORMATION

| | | **Lead Attorneys** |
|---|---|---|
| **Defendant** | **Southwest Airlines** | **Marisa Secco** |
| | | *Retained* |
| | | 512-542-8781(W) |
| | | |
| **Plaintiff** | **Hall, Joseph** | |

---

### EVENTS & ORDERS OF THE COURT

**OTHER EVENTS AND HEARINGS**

| 11/09/2018 | **Non Military Affidavit** | |
|---|---|---|
| 11/09/2018 | **Plaintiff's Original Petition** | |
| 11/13/2018 | **Citation** | |
| 11/13/2018 | **Citation** | |
| | Southwest Airlines | Unserved |
| 11/15/2018 | **Notice of** | |
| 11/28/2018 | **Defendant's Original Answer** | |

1JC-18-1964

## PETITION: SMALL CLAIMS CASE

Joseph Hall
*Plaintiff*

§

§

§

In the Justice Court of

Williamson County, Texas

Precinct One

Southwest Airlines
*Defendant*
Corp. Service Company
Person to serve

**COMPLAINT:** The basis for the claim which entitles the plaintiff to seek relief against the defendant is:
I have flown South West Airline from 2014 - 2018
Attached you will find my reservation number I could
find but you would have that flight info.
Resv # HFP A014 /22 Aug 2015 / Confirmation # RI 3748
30 May 2018, although I have flown more I can only show
these flights.

**RELIEF:** Plaintiff seeks damages in the amount of $ 10,000 , and/or return of personal property as described as follows
(be specific): _____ , which has a value of $_____ . Additionally, plaintiff seeks
the following: _____ Court Cost _____

**SERVICE OF CITATION:** Service is requested on defendants by personal service at home or work or by alternative
service as allowed by the Texas Justice Court Rules of Court.  Other addresses where the defendant(s) may be served are:
_____

[X] If you wish to give your consent for the answer and any other motions or pleadings to be sent to your email address, please
check this box, and provide your valid email address: Chardin 46 @ Yahoo. Com

| Defendant's Information | Plaintiff's Information |
|---|---|
| Southwest Airlines c/o Corp Service Company | ___ ~ Rsh ___ gcol Joseph Hall |
| Printed Defendant's Name | Signature of the Plaintiff or Attorney |
| 311 E. 7th St. | Joseph Hall |
| Address of Defendant's Attorney, if any, or Defendant if none | Print Plaintiff's Name |
| Austin Ty 78665 | 8061 Mozart St. |
| City, State, Zip | Address of Plaintiff's Attorney, if any, or Plaintiff if none |
| DATE OF BIRTH: _____ | |
| LAST 3 NUMBERS OF DRIVER LICENSE: _____ | Round rock Ty 78665 |
| *LAST 3 NUMBERS OF SOCIAL SECURITY: _____ | City, State, Zip |
| DEFENDANT'S PHONE NUMBER: _____ | 512 - 945 - 9573 |
| | Phone & Fax No. of Plaintiff's Attorney, if any, or Plaintiff if none |

*JUSTICE COURT PRECINCT ONE*
*WILLIAMSON COUNTY, TEXAS*

Rev. 1/2017



ISSUED BY AND VALID ONLY ON

**SOUTHWEST AIRLINES®**          **BOARDING PASS**

**HALL/JOSEPH**
JOSEPH HALL

Flight **1223**          Gate B21

May 30, 2018

Confirmation Number:  RI37U8

FROM   TO   FLT#   TIME      FB   BOARDING
MDW    AUS   1223   07:50PM   H    07:20PM

Boarding
Group

**C**

Position

**28**

WNC472FA          RI37U8

**SOUTHWEST AIRLINES**
**OPEN SEATING**                    28

**HALL/JOSEPH**
Conf.   RI37U8
May 30, 2018
1223   CHICAGO MIDWAY I
        to   AUSTIN BERGST

**C**
**28**

JUSTICE COURT, PRECINCT ONE
WILLIAMSON COUNTY, TEXAS
2018 NOV -9  PM 4: 12

**COPY**

No: 1JC-18-1964

| | | |
|---|---|---|
| JOSEPH HALL | § | IN THE JUSTICE COURT OF |
| VS | § | WILLIAMSON COUNTY, TEXAS |
| SOUTHWEST AIRLINES | § | PRECINCT ONE |

# CITATION
### (Civil Citation)

**SOUTHWEST AIRLINES**
<u>**Person to be Served:**</u> **Corp. Services Company**
**311 E. 7TH ST**
**AUSTIN TX 78665**

THE STATE OF TEXAS: TO Southwest Airlines, DEFENDANT, in the hereinafter-styled and numbered case:

**YOU HAVE BEEN SUED. You may employ an attorney to help you in defending against this lawsuit. But you are not required to employ an attorney. You or your attorney must file an answer with the court. Your answer is due by the end of the 14th day after the day you were served with these papers. If the 14th day is a Saturday, Sunday, or legal holiday, your answer is due by the end of the first day following the 14th day that is not a Saturday, Sunday, or legal holiday. Do not ignore these papers. If you do not file an answer by the due date, a default judgment may be taken against you. For further information, consult Part V of the Texas Rules of Civil Procedure, which is available online and also at the court listed on this citation.**

<u>**You are to answer with the court, located at 1801 E. Old Settlers Blvd, Suite 100, Round Rock, TX 78664**</u>
**If you fail to file an answer, judgment by default may be rendered for the relief demanded in the petition.**

The substance of the Plaintiff's demand and claim being as follows:

## SEE ATTACHED
### *Filed on: November 09, 2018.*

| | |
|---|---|
| *Plaintiff:*  JOSEPH HALL | *Plaintiff's* |
| 8061 NOZART ST | *Attorney/Agent:* |
| ROUND ROCK, TX 78665 | |

ISSUED, on this the 13th day of November, 2018.

Delivered On:_____

By Deputy:_____



Dain Johnson
Justice of the Peace, Pct. 1
TEL: 512-244-8620

---

**OFFICER'S RETURN**

Came to hand on _____ at _____ and executed at _____within

Williamson County, Texas on _____ at _____ by delivering to _____,

Defendant, a true copy of this citation together with a copy of the petition, having first attached such copy of such petition to such copy of citation and endorsed on such copy of citation the date of delivery

_____

Officer's Return

Filed 11/28/2018 4:28 PM
Judge Dain Johnson
Justice of the Peace, Precinct 1
Williamson County

CAUSE NO. 1JC-18-1964

| | | |
|---|---|---|
| JOSEPH HALL, | § | IN THE JUSTICE COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | PRECINCT 1 |
| | § | |
| SOUTHWEST AIRLINES CO. | § | |
| | § | |
| *Defendant.* | § | |
| | § | |
| | § | |
| | § | WILLIAMSON COUNTY, TEXAS |

## SOUTHWEST AIRLINES CO.'S ORIGINAL ANSWER

Defendant Southwest Airlines Co. ("Southwest") files this Original Answer (the "Answer") to the Petition: Small Claims Case (the "Petition") of Plaintiff Joseph Hall ("Hall"), and would show this Honorable Court as follows:

### I.  PARTIES

1.      Defendant Southwest is a Texas corporation with its headquarters at 2702 Love Field Drive, Dallas, Texas 75235.

2.      Plaintiff Hall is an individual residing at 8061 Mozart St., Round Rock, Texas 78665.

### II.  BACKGROUND & FACTS

3.      Starting in June 2015, putative class action lawsuits were brought in multiple federal district courts across the country alleging that Southwest and three other airlines had violated Sections 1 and 3 of the Sherman Antitrust Act.  The cases were consolidated in the United States District Court for the District of Columbia under the caption *In re Domestic Airline Travel Antitrust Litigation,* No. MDL 2656 (the "Class Action").  On March 25, 2016, the plaintiffs (the "Class Action Plaintiffs") filed a Consolidated Amended Class Action Complaint, which is

attached hereto as Exhibit A.  The suit alleges that the four airlines conspired to "fix, raise, maintain, and/or stabilize prices for air passenger transportation services."[1]

4.      On December 20, 2017, Southwest entered into a settlement agreement (the "<u>Class Action Settlement</u>") with the Class Action Plaintiffs.  On January 3, 2018 the United States District Court for the District of Columbia preliminarily approved the Class Action Settlement.[2]

5.      The Class Action Settlement provides an opt out period for class members which continues until January 4, 2019.  Hall claims to have opted out through the settlement process and subsequently brought this suit.  In the present suit, Hall asserts the same federal antitrust claims against Southwest that were asserted in the Class Action.

### III.  GENERAL DENIAL

6.      Pursuant to Texas Rule of Civil Procedure 502.5(b), Southwest denies each and every allegation in Hall's Petition and demands strict proof thereof.

### IV.  PLEA TO THE JURISDICTION

7.      Pursuant to Texas Rule of Civil Procedure 85, without assuming any burden or duty not already imposed on it by law, Southwest asserts the following plea to the jurisdiction:

8.      By opting out of the Class Action Settlement, Hall attempts to seek the relief from the Class Action on an individual basis.  But those antitrust claims are made under the Sherman Act (15 U.S.C. §§ 1-7) and are therefore barred due to this Court's lack of subject matter jurisdiction.

9.      Federal courts have exclusive jurisdiction over federal antitrust claims.   The Sherman Act states that "[t]he several district courts of the United States are invested with jurisdiction to prevent and restrain violations . . . of this title."  15 U.S.C § 4; *see also Marrese v.*

---

[1] Exhibit A, ¶ 1.
[2] Order Preliminarily Approving Settlement with Defendant Southwest Airlines Co. attached as Exhibit B.

Envelope# 29328052
Case# 1JC-18-1964

*Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 379 (1985) ("[F]ederal antitrust claims are within the exclusive jurisdiction of the federal courts"); *see also Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 699 (Tex. 2006) ("[F]ederal courts already have exclusive jurisdiction of federal antitrust claims.") (citation omitted).

10.    Because Hall's claims are subject to exclusive federal jurisdiction, this Court lacks subject matter jurisdiction to hear Hall's claims, and such claims should accordingly be dismissed.

## V.  ADDITIONAL DEFENSES

11.    Hall's claims cannot be heard by this Court because he failed to adhere to Rule 502.4 of the Texas Rules of Civil Procedure regarding venue.  Southwest does not reside in Williamson County and has no presence in Williamson County; the incidents or majority of incidents, i.e., alleged anti-trust violations, that gave rise to the claim did not occur in Williamson County; there is no contract/agreement that gave rise to Hall's claim; and this is not a suit to recover personal property.

12.    Southwest reserves its right to amend its Answer in accordance with the Texas Rules of Civil Procedure and reserves the right to assert additional defenses that may become apparent during the course of this action.

## VI.  PRAYER FOR RELIEF

13.    WHEREFORE, by reason of the foregoing, Southwest respectfully requests that the Court grant the following relief:

a.    Entering a judgment that Hall take nothing by his suit and/or that the Court lacks subject matter jurisdiction and venue to hear Hall's claims;

b.    Awarding Southwest its attorneys' fees, costs, and other expenses incurred in this action; and

c.    Granting such other relief, general or special, at law or in equity, that this Court deems just and proper.

3

Respectfully submitted,

VINSON & ELKINS LLP

*/s/ Marisa Secco*

**Marisa Secco**
Texas Bar No. 24060583
**Rafic Bittar**
Texas Bar No. 24101520
2801 Via Fortuna, Suite 100
Austin, TX 78746-7568
Telephone: 512.542.8781
Facsimile: 512.263.3243
msecco@velaw.com
rbittar@velaw.com

**COUNSEL FOR DEFENDANT
SOUTHWEST AIRLINES CO.**

4

## CONSENT TO EMAIL SERVICE

Under Texas Rule of Civil Procedure 502.5(3), Defendant Southwest consents to email service.  Electronic service shall be provided to the following recipients:

    i.      msecco@velaw.com
    ii.     aatkins@velaw.com
    iii.    tbohnett@velaw.com
    iv.    rbittar@velaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2018, a true and correct copy of the foregoing document was served on Plaintiff as indicated below:

Joseph Hall
8061 Mozart St.
Round Rock, Texas 78665

**By certified mail and regular mail**

/s/ Rafic Bittar
Rafic Bittar

5

Filed 11/28/2018 4:28 PM
Judge Dain Johnson
Justice of the Peace, Precinct 1
Williamson County

# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE DOMESTIC AIRLINE TRAVEL ANTITRUST LITIGATION | MDL Docket No. 2656 <br> Misc. No. 15-1404 (CKK) <br><br> JURY TRIAL DEMANDED |
| This Document Relates To: <br><br> ALL CASES. | |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**Exhibit A**

Envelope# 29328052
Case# 1JC-18-1964

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ..................................................................................................1

II.    JURISDICTION AND VENUE .........................................................................................3

III.   PLAINTIFFS ........................................................................................................................3

IV.   DEFENDANTS ....................................................................................................................6

V.    NON-PARTY CO-CONSPIRATORS ...........................................................................7

VI.   AGENTS ...............................................................................................................................7

VII.  INTERSTATE TRADE AND COMMERCE ...............................................................7

VIII. FACTUAL ALLEGATIONS .............................................................................................8

      A. THE STRUCTURE OF THE INDUSTRY IS CONDUCIVE TO
          COORDINATED BEHAVIOR .................................................................................8

      B. ECONOMIC AND OTHER EVIDENCE SUPPORTS THE CONCLUSION
          THAT DEFENDANTS HAVE PRICED DOMESTIC AIRFARES
          DIFFERENTLY FROM THE REST OF THE INDUSTRY AND EARNED
          HUGE PROFITS AS A RESULT ........................................................................22

      C. CAPACITY AND PRICING IN THE AIRLINE
          INDUSTRY PRIOR TO 2009 ...............................................................................35

      D. "CAPACITY DISCIPLINE" DURING 2009-15 ...............................................37

      E. SOUTHWEST'S RECENT PROPOSAL TO ADD CAPACITY, THE
          RESPONSES AT THE 2015 IATA GENERAL MEETING, AND
          SOUTHWEST'S REVERSAL OF POSITION .................................................58

      F. REACTIONS OF SENATORS, REGULATORS AND OTHERS ..................61

      G. DEFENDANTS ENGAGE IN OTHER PRACTICES THAT FACILITATE
          COLLUSION ON CAPACITY REDUCTION .................................................67

      H. CLASS ACTION ALLEGATIONS ....................................................................72

IX.   CAUSE OF ACTION ........................................................................................................75

X.    PRAYER FOR RELIEF ....................................................................................................76

Envelope# 29328052
Case# 1JC-18-1964

Filed: 11/28/2018 4:28 PM
Judge Date of 38th
Justice of the Peace, Precinct 1
Williamson County

Plaintiffs, by and through their undersigned attorneys, allege as follows, based upon information and belief except as to allegations relating to themselves:

## I.   NATURE OF THE ACTION

1.     This action arises out of a conspiracy by the four largest commercial air passenger carriers in the United States—American Airlines, Inc. ("American"), Delta Air Lines, Inc. ("Delta"), Southwest Airlines Co. ("Southwest"), and United Airlines, Inc. ("United") (collectively, "Defendants")—to fix, raise, maintain, and/or stabilize prices for air passenger transportation services within the United States, its territories and the District of Columbia in violation of Sections 1 and 3 of the Sherman Antitrust Act (15 U.S.C. §§ 1, 3), by, *inter alia*, colluding to limit capacity on their respective airlines. Plaintiffs allege that the conspiracy commenced in the first quarter of 2009 and continues to the present. During that period, Defendants' airfares rose substantially compared to those of other domestic air carriers, despite stagnant or decreasing demand and declines in the cost of jet fuel. Plaintiffs seek recovery of treble damages for the period from July 1, 2011 to the present (the "Class Period").

2.     The domestic air passenger industry used to be marked by numerous major competitors, price wars and addition of passenger capacity. It is now highly concentrated, with the four Defendants controlling approximately 80% of available passenger seats and with high barriers to entry. Airfares are also transparent to the Defendants, who jointly own or participate in the Airline Tariff Publishing Company ("ATPCO"), which enables them to police each other's fares and adjust their own respective airfares on a real time basis.

3.     The alleged conspiracy was carried out, *inter alia*, by repeated assurances by the executives of Defendants to each other that: (a) each of their companies is engaging in "capacity discipline" (*i.e.*, reduction or relative stabilization of airline capacity); (b) this is a practice that

1

has to be utilized by the industry as a whole; (c) it is good for the industry as a whole; and (d) it reflects the collective commitment of the Defendants' airline managers. These communications occurred on earnings calls with analysts, at numerous airline industry or other conferences held each year (which representatives of the Defendants attended), and at meetings of the International Air Transport Association ("IATA"). The Defendants facilitated this conspiracy through, *inter alia*, limiting the ability of consumers to compare airfares, and deterring potential competitive entry by foreign air passenger carriers.

4.     As a result of these efforts, airline capacity has deviated from historical patterns, and has largely been stagnant or decreasing on an annual basis, despite the recovery from the Great Recession and positive GDP growth. Passengers have been injured by paying higher airfares and facing reduced flight choices.

5.     In May of 2015, Gary C. Kelly ("Kelly"), the CEO of Southwest, broke ranks and made a public statement that his company was willing to make a significant increase in capacity at its hub in Dallas, Texas. Executives of other airlines reacted at the annual meeting of IATA the following month, saying the "industry" had to hold the line on "capacity discipline." Kelly promptly scaled back his plans.

6.     At the urging of members of Congress, the Antitrust Division of the United States Department of Justice ("DOJ") issued civil investigative demands ("CIDs") to the Defendants.[1] Airfares plunged for a while, but the Defendants still earned record profits in 2015 and pushed through fare increases in 2016, thanks to their shared capacity discipline.

7.     The conduct at issue constitutes a violation of federal antitrust laws.[2]

---

[1] State Attorneys General are also investigating the conduct at issue.

[2] This is not the first case to allege collusive coordination on capacity reduction between major United States passenger airlines. A similar claim was advanced against Delta and AirTran where

Envelope# 29328052
Case# 1JC-18-1964

## II. JURISDICTION AND VENUE

8.      This complaint is filed under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) to recover treble damages, equitable relief, costs of suit, and reasonable attorneys' fees for violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3). The Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act.

9.      Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22), and 28 U.S.C. § 1391(b), (c), and (d) because Defendants reside, transact business, are found within, and/or have agents within this District, a substantial part of the events giving rise to Plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this District.

10.     This Court has personal jurisdiction over Defendants because, *inter alia,* each: (a) transacted business in this District; (b) directly or indirectly sold and delivered passenger air transportation in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy and agreement to limit capacity that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

### III. PLAINTIFFS

11.     Plaintiff Boston Amateur Basketball Club ("the Club") is a non-profit corporation registered in Massachusetts. During the Class Period, the Club purchased air passenger transportation for domestic travel directly from Defendants American (or its predecessor, U.S. Airways Group ("U.S. Airways")), Delta, and United. The Club has suffered pecuniary injury by

---

it was alleged that such conduct was carried out through public signaling by the executives of each company; a motion to dismiss that claim was denied. *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1359-62 (N.D. Ga. 2010).

Envelope# 29328052
Case# 1JC-18-1964

paying artificially inflated ticket prices as a result of the antitrust violation alleged herein. The Club purchased tickets for use by its members and not for re-sale.

12.    Plaintiff Katherine Rose Warnock ("Warnock") is a resident of New Jersey. During the Class Period, Warnock purchased air passenger transportation for domestic travel directly from Defendants United and Southwest. Warnock has suffered pecuniary injury by paying artificially inflated ticket prices as a result of the antitrust violation alleged herein. Warnock purchased tickets for her own personal use or for relatives and not for re-sale.

13.    Plaintiff Cherokii Verduzco ("Verduzco") is a resident of California. During the Class Period, Verduzco purchased air passenger transportation for domestic travel from Defendant United through Travelocity.com. Verduzco also purchased tickets directly from Defendants American, Delta, and Southwest. Verduzco has suffered pecuniary injury by paying artificially inflated ticket prices as a result of the antitrust violation alleged herein. Verduzco purchased tickets for her own personal use and not for re-sale.

14.    Plaintiff Kumar Patel ("Patel") is a resident of Alabama. During the Class Period, Patel purchased air passenger transportation for domestic travel directly from Defendant Delta. Patel has suffered pecuniary injury by paying artificially inflated ticket prices as a result of the antitrust violation alleged herein. Patel purchased tickets for his own personal use and not for re-sale.

15.    Plaintiff Samantha White ("White") is a resident of North Carolina. During the Class Period, White purchased air passenger transportation for domestic travel directly from Defendants American and Delta. White has suffered pecuniary injury by paying artificially inflated ticket prices as a result of the antitrust violation alleged herein. White purchased tickets for her own personal use and not for re-sale.

Envelope# 29328052
Case# 1JC-18-1964

16.     Plaintiff Seth Lyons ("Lyons") is a resident of California. During the Class Period, Lyons purchased air passenger transportation for domestic travel directly from Defendants American (or its merger partner U.S. Airways) and Delta. Lyons also purchased air passenger transportation from Defendant United through Orbitz.com. Lyons has suffered pecuniary injury by paying artificially inflated ticket prices as a result of the antitrust violation alleged herein. Lyons purchased tickets for his own personal use or the use of others and not for re-sale. He was not reimbursed for tickets purchased for others.

17.     Plaintiff Barbara Cone ("Cone") is a resident of New York. During the Class Period, Cone purchased air passenger transportation for domestic travel directly from Defendants American (or its merger partner U.S. Airways), Delta, and United. Cone also purchased air passenger transportation for domestic travel from Defendant American (or its merger partner U.S. Airways) through Priceline.com and Orbitz.com; from Defendant Delta Airlines through Expedia.com; and from Defendant United through Orbitz.com. Cone has suffered pecuniary injury by paying artificially inflated ticket prices as a result of the antitrust violation alleged herein. Cone purchased tickets for her own personal use and not for re-sale.

18.     Plaintiff Howard-Sloan Koller Group Inc. ("HSK"), is a New York corporation. During the Class Period, HSK purchased air passenger transportation for domestic travel directly from Defendant American. HSK has suffered pecuniary injury by paying artificially inflated ticket prices as a result of the antitrust violation alleged herein. HSK purchased tickets for use by its employees on official business and not for re-sale.

19.     Plaintiff Breanna Jackson ("Jackson") is a resident of California. During the Class Period, Jackson purchased air passenger transportation for domestic travel directly from Defendants Delta and Southwest. Jackson has suffered pecuniary injury by paying artificially

Envelope# 29328052
Case# 1JC-18-1964

inflated ticket prices as a result of the antitrust violation alleged herein. Jackson purchased tickets for her own personal use or the use of family members and friends and not for re-sale. Jackson was not reimbursed for the cost of tickets she purchased for family members and friends.

20.     Plaintiff Stephanie Jung ("Jung") is a resident of California. During the Class Period, Jung purchased air passenger transportation for domestic travel directly from Defendant Southwest. Jung has suffered pecuniary injury by paying artificially inflated ticket prices as a result of the antitrust violation alleged herein. Jung purchased tickets for her own personal use and not for re-sale. Jung also purchased tickets for others, but she was not reimbursed for the cost of those tickets.

21.     Plaintiff Elizabeth Cumming ("Cumming") is a resident of Louisiana. During the Class Period, Cumming purchased air passenger transportation for domestic travel from Defendant Southwest, both directly as well as through Flyfar.ca. Cumming has suffered pecuniary injury by paying artificially inflated ticket prices as a result of the antitrust violation alleged herein. Cumming purchased tickets for her own personal use and not for re-sale.

22.     Plaintiffs Steven Yeninas ("Yeninas") is a resident of the District of Columbia. During the Class Period Yeninas purchased air passenger transportation for domestic travel from Defendants American and Southwest. Yeninas has suffered pecuniary injury by paying artificially inflated ticket prices as a result of the antitrust violation alleged herein. Yeninas purchased tickets for his own personal use and not for re-sale.

### IV. DEFENDANTS

23.     Defendant American is a domestic corporation with its principal place of business located at 4333 Amon Carter Boulevard, Fort Worth, TX 76155. American conducts air passenger transportation services throughout the United States, including flights sold and

6

purchased in this District.

24. Defendant Delta is a domestic corporation with its headquarters at 1030 Delta Boulevard, Atlanta, Georgia, 30354. Delta conducts air passenger transportation services throughout the United States, including flights sold and purchased in this District.

25. Defendant Southwest is a domestic corporation with its headquarters at 2702 Love Field Drive, Dallas, Texas, 75235. Southwest conducts air passenger transportation services throughout the United States, including flights sold and purchased in this District.

26. Defendant United is a domestic corporation with its headquarters located at 233 S. Wacker Drive, Chicago, Illinois, 60606. United conducts air passenger transportation services throughout the United States, including flights sold and purchased in this District.

## V. NON-PARTY CO-CONSPIRATORS

27. On information and belief, at all relevant times, other airlines, entities, and/or persons, including, but not limited to, U.S. Airways (prior to its merger with American), Air Canada and IATA, willingly conspired with Defendants in their unlawful restraint of trade. All averments herein against Defendants are also averred against these unnamed co-conspirators.

## VI. AGENTS

28. The acts alleged to have been done by Defendants were authorized, ordered, or performed by their directors, officers, managers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

## VII. INTERSTATE TRADE AND COMMERCE

29. Throughout the Class Period, there was a continuous and uninterrupted flow of invoices for payment, payments, and other documents essential to the provision of air passenger transportation services transmitted interstate between and among offices of Defendants and their

Envelope# 29328052
Case# 1JC-18-1964

customers located throughout the world, including throughout the United States.

30.     Throughout the Class Period, Defendants transported substantial numbers of passengers in a continuous and uninterrupted flow of interstate commerce between various airports in the United States.

31.     Throughout the Class Period, Defendants' unlawful activities, as described herein, took place within and substantially affected the flow of interstate commerce and had a direct, substantial, and reasonably foreseeable effect upon commerce in the United States.

## VIII.   FACTUAL ALLEGATIONS

32.     The organization of this factual section is as follows. First, Plaintiffs will present allegations concerning the structure of the domestic air passenger industry, showing how it is conducive to collusion. Then, they will present allegations based on economic and anecdotal evidence on how the Defendants' pricing practices, how they differ from other domestic airlines and how they have resulted in huge profits. Plaintiffs will then present allegations on capacity reduction in the industry prior to 2009 and during the period of 2009-15. They will then describe what happened in 2015 when Southwest proposed to add capacity. Finally, they will detail certain practices that facilitate the Defendants' alleged conspiracy.

### A.  THE STRUCTURE OF THE INDUSTRY IS CONDUCIVE TO COORDINATED BEHAVIOR

33.     The structure of the industry is conducive to collusion. This is a function of several factors, including industry concentration, high barriers to entry, the presence and use of ATPCO, and the use of cross-market initiatives ("CMIs").  This propensity to collude by airlines is demonstrated by a number of governmental and private actions brought against them.

34.     *Industry Concentration*. The domestic airline passenger industry is a tight oligopoly. Due to a series of mergers, particularly since 2008, American, Delta, United and

Envelope# 29328052
Case# 1JC-18-1964

Southwest now control approximately 80% of the domestic air passenger seats.

35.     The domestic airline industry in the United States includes passenger flights between the 50 states, the District of Columbia, Puerto Rico, and the Virgin Islands. In 2014, over 662 million passengers travelled within the United States on more than eight million flights generating $145.8 billion in revenue for United States carriers.

36.     The current oligopolistic structure of the industry is the product of several airline mergers that are depicted in the following chart:



Envelope# 29328052
Case# 1JC-18-1964

37.    In short, the industry went from ten major domestic air-passenger carriers to four within a decade. Average market concentration in airline hubs from 2004-14, as measured by the Herfindahl-Hirschman Index ("HHI"),[3] was between 3,400 and 3,750, according to a September 22, 2015 letter from the American Antitrust Institute ("AAI") to the DOJ, which demonstrates a highly concentrated market.[4] The AAI in a 2013 study noted that prior to and after the merger of Delta and Northwest Airlines, 10% of airport pairs were eliminated from the merged entity's network; similarly, airport pair reductions for the United-Continental Airlines and Southwest-AirTran mergers were 9% and 22%, respectively.[5] These mergers have had a particularly adverse impact on capacity reduction at airports serving smaller cities.[6]

38.    In its complaint challenging the merger between American and U.S. Airways in *United States v. U.S. Airways Group, Inc.*, No. 1:13-cv-01236 (D.D.C.) ("*U.S Airways* Complaint"), which was filed on August 13, 2013,[7] the DOJ noted that "[t]he structure of the industry is already conducive to coordinated behavior." It cited an internal U.S. Airways presentation that concluded that industry consolidation has resulted in "Fewer and Larger Competitors." This structural change allowed "[t]he industry" to "reap the benefits," one of

---

[3] The HHI is a measure of market concentration used by federal regulators and is calculated by squaring the market share of the firms (or the major firms) competing in a given market. An HHI in excess of 2,500 means that the market in question is highly concentrated. https://www.justice.gov/atr/herfindahl-hirschman-index.

[4] http://www.antitrustinstitute.org/sites/default/files/Letter%20to%20DOJ_Collusion%20Probe_F.pdf.

[5] http://www.antitrustinstitute.org/sites/default/files/AAI_USAir-AA_Efficiencies.pdf.

[6] http://dspace.mit.edu/bitstream/handle/1721.1/90076/890141840-MIT.pdf?sequence=2

[7] http://www.justice.gov/file/514531/download. *See also* August 13, 2013 DOJ Press Release (available at http://www.justice.gov/opa/pr/justice-department-files-antitrust-lawsuit-challenging-proposed-merger-between-us-airways-and.)

Envelope# 29328052
Case# 1JC-18-1964

which was identified as "capacity reductions."[8]

39.     It should be noted that industry consolidation has had a direct impact on reduction of capacity by domestic passenger carriers. The *U.S. Airways* Complaint discussed at length how the history of airline mergers had led to airline reductions through "capacity discipline." The airlines' use of that term is itself a warning sign; as one antitrust expert said, "[t]he word 'discipline' is a no no. It's one of the words you don't use. It's like 101 in [antitrust] compliance."[9] A more detailed history of the Defendants' efforts to achieve "capacity discipline" is recounted later in this Complaint. What the DOJ had to say on this topic in the *U.S. Airways* Complaint was as follows:

> ***Legacy airlines have taken advantage of increasing consolidation to exercise "capacity discipline." "Capacity discipline" has meant restraining growth or reducing established service.*** The planned merger would be a further step in that industry-wide effort. In theory, reducing unused capacity can be an efficient decision that allows a firm to reduce its costs, ultimately leading to lower consumer prices. In the airline industry, however, recent experience has shown that capacity discipline has resulted in fewer flights and higher fares.
>
> …...
>
> U.S. Airways has recognized that it benefitted from this industry consolidation and the resulting capacity discipline. U.S. Airways has long taken the position that the capacity cuts achieved through capacity discipline "enabled" fare increases and that "pricing power" results from "reduced industry capacity." ***U.S. Airways' CEO explained to investors in 2006 that there is an "inextricable link" between removing seats and raising fares***.

 (Emphases added).

---

[8] The DOJ ultimately settled this case, allowing the merger to occur, conditioned on the divestiture of certain flight slots. The merger has been consummated, resulting in significant further consolidation, and U.S. Airways ceased operations in October of 2015. https://www.washingtonpost.com/business/the-last-days-of-us-airways/2015/09/25/f5530686-60a6-11e5-8e9e-dce8a2a2a679_story.html.

[9] http://www.reuters.com/article/us-usa-airlines-collusion-idUSKCN0PC2HT20150702.

Envelope# 29328052
Case# 1JC-18-1964

40.     In sum, as one industry analyst noted, the "new structure" is one of "air travel oligopoly."[10] This created a situation where collusion can thrive. As Assistant Attorney General William Baer ("Baer") noted in press remarks on July 14, 2015, "[i]n my experience looking at markets with just a few players, sometimes there is a temptation to coordinate behavior."[11]

41.     ***Concentration of Stockowners In Airlines***. In addition, the concentrated structure of the United States air passenger industry's concentrated structure is matched by the concentrated number of major investors in the major passenger airlines, a factor that is also conducive to collusion. This is reflected in the following chart from BloombergBusiness:[12]



**Concentration of Airline Holders**
At the biggest U.S. carriers, the top five investors collectively own stakes of at least 20 percent

SOURCE: Securities and Exchange Commission filings compiled by Bloomberg

Bloomberg

42.     BloombergBusiness reports that the four largest stockholders in the Defendant airlines are BlackRock, Inc. ("BlackRock"), State Street Corporation, J.P. Morgan Chase & Co.,

---

[10] http://airwaysnews.com/blog/2014/12/30/us-airlines-wont-lose-capacity-discipline-because-of-oil/.

[11] https://bol.bna.com/antitrust-chief-turns-his-sights-to-airlines/.

[12] http://www.bloomberg.com/news/articles/2015-09-22/do-airfares-rise-when-carriers-have-same-investors-u-s-asks

Envelope# 29328052
Case# 1JC-18-1964

Primecap, and Capital Group Companies (which operates the American Funds group).[13]

43.     The economic literature supports the conclusion that such cross-ownership of airlines can lead to higher airfares. In April of 2015, The Ross School of Business at the University of Michigan released a study by Jose Azar, Martin C. Schmalz ("Schmalz") and Isabel Tecu entitled "Anti-Competitive Effects of Common Ownership"  ("Azar-Schmalz-Tecu Study").[14] It focused on common ownership in the airline industry, looking at the impact of BlackRock's acquisition of Barclays Global Investors ("BGI") in 2009 (BGI also had significant investment positions in domestic air passenger carriers). The study found that such common ownership translated to 3%-11% higher ticket prices. Schmalz gave two possible reasons for this correlation:  (1) "airline executives may hold back from aggressive competition -- expanding capacity, for example, or lowering prices -- because they know it's not in the interests of their biggest shareholders, which also own stakes in their competitors," and (2) airline executives "could in theory coordinate moves on pricing or capacity by communicating strategy through discussions with large investors."[15] The study was presented to the DOJ, which provided suggestions to the author.[16]

44.     A 2015 article by Einer Elhauge ("Elhauge"), entitled "Horizontal Shareholding,"[17] makes the similar point that when a common set of investors own significant

---

[13] http://www.mb.com.ph/us-govt-probes-4-largest-us-airlines-for-fare-collusion/.

[14] http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2427345.

[15] http://www.bloomberg.com/news/articles/2015-09-22/do-airfares-rise-when-carriers-have-same-investors-u-s-asks.

[16] *Id.*

[17] The article appears in 92 Harv. L. Rev. 1267 (2016) and may be found here: http://cdn.harvardlawreview.org/wp-content/uploads/2016/03/1267-1317-Online.pdf.

Envelope# 29328052
Case# 1JC-18-1964

shares in companies that compete with each other in a concentrated market, anticompetitive price increases are likely to occur. Elhauge noted that "from 2013-15, seven shareholders who controlled 60% of United Airlines also controlled big chunks of United's major rivals, including 27.5% of Delta Airlines, [and] 22.3% of Southwest Airlines…." Elhauge discussed the results of the Azar-Schmalz-Tecu Study. As Elhauge stated:

> The basic anticompetitive effects arise from the fact that interlocking shareholdings diminish each *individual* firm's incentives to cut prices or expand output by increasing the costs of taking away sales from rivals. To be sure, horizontal shareholdings might also produce communications that aid coordination among firms, which would make the anticompetitive effects even worse.[18]

(Emphasis in original; footnote omitted).

45. These large shareholders have an incentive to keep airfares and fees high, and hence airlines' revenues high, because higher revenue leads to higher share prices for themselves and other shareholders. Indeed, as depicted below in a presentation made by United at Deutsche Bank's 2014 Global Industrial & Basic Materials Conference, airlines' investors have done quite well, as airlines' stocks have outperformed industrials by 160 percent since 2009:

---

[18] *Id*. at 1274.

14

Envelope# 29328052
Case# 1JC-18-1964



46.     Baer of DOJ testified before the Subcommittee on Antitrust, Competition Policy and Consumer Rights of the Judiciary Committee of the United States Senate on March 9, 2016 that the agency is currently investigating the common ownership of the major domestic air passenger carriers as part of its investigation of unlawful coordination by Defendants. He stated that "[w]hen you do have common ownership, and active shareholders, what incentive do they have to have one company stand out over the other?...The common ownership thing is a phenomenon that I had not seen in my prior years of antitrust service at [the Federal Trade Commission]. I can tell you this is an issue that we are looking at, that we are looking at in more than one industry."[19]

47.     ***Barriers To Entry***. There are high barriers to entry due to government regulations

_____

[19] http://www.mlex.com/GlobalAntitrust/DetailView.aspx?cid=776246&siteid=191&rdir=1.

15

Envelope# 29328052
Case# 1JC-18-1964

restricting access to airports and gates, large capital requirements for technology and equipment, and the nature of the ticketing and reservation system, which means existing firms can raise prices above competitive levels and earn high levels of profits.

48.     ***Presence And Use of ATPCO***. All airlines have complete, accurate, and real-time access to every detail of every other airline's published fare structure on every route through ATPCO. U.S. Airways' management called ATPCO "a dedicated price-telegraph network for the industry."[20] ATPCO is owned by the airlines, including Delta, United and American.

49.     Airlines submit their pricing data to ATPCO, which then processes and sends the data submitted by all airlines to each of its members. The pricing data include a fare base code (the name of the fare), the dollar amount, fare rules or restriction, a first ticket date information (which indicates the first date a fare would be available for sale), and a last ticket date (which indicates the last date a fare would be available for sale). Using the first ticket date and the last ticket date, Defendants can change when fares become available for sale or when fares are no longer available for sale. Defendants submit, among other things, these changes to ATPCO at least once each weekday.

50.     After ATPCO receives the fare changes from a Defendant, it processes the changes, and disseminates the information to other airlines, including other Defendants. The Defendants, either directly or through an ATPCO subscriber, employ sophisticated computer systems that sort the fare information and generate detailed reports, which allow the airlines to monitor and analyze each other's fare changes and proposed fare changes, including the first ticket date fares, which are not yet available for sale to the public. The public does not have access to ATPCO.

---

[20] http://beta.kluwercompetitionlaw.com/Document/Details/kli-kcl-ecomp-201356430#open-document.

16

51.     In 1992, the United States filed a lawsuit to stop several airlines from using their ATPCO filings as a device to facilitate agreements on fares. That lawsuit resulted in a consent decree, discussed below.[21] In its competitive impact statement concerning that consent decree, the DOJ explained that it had accused the defendants in that case (including American, United, Delta, and U.S. Airways), of engaging in "various combinations and conspiracies" with each other that consisted of agreements, understandings, and concerted actions to fix prices by increasing fares, eliminating discount fares, and setting fare restrictions for tickets purchased for travel between cities in the United States."[22] The DOJ asserted that the airlines used ATPCO to "(1) exchange proposals and negotiate fare changes; (2) trade fare changes in certain markets in exchange for fare changes in other markets; and (3) exchange mutual assurances concerning the level, scope, and timing of fare changes."[23]

52.     The competitive impact statement further asserted that the airlines had been charged with using ATPCO to "unnecessarily facilitate [] coordinated interaction among the airline defendants and co-conspirators, enabling them to: (1) communicate more effectively with each other to increase fares, change fare restrictions, and eliminate discounts; (2) show links between proposed fare changes in different city-pair markets; (3) monitor each other's proposals on fare changes; and (4) lessen uncertainty concerning each other's pricing intentions."[24]

53.     The consent decree in the ATPCO litigation lasted for ten years until 2004. As late as 2004, the DOJ imposed a $3 million civil penalty against American for violating the

---

[21] *United States v. Airline Tariff Pub. Co.*, 836 F. Supp. 9 (D.D.C. 1993). *See* http://faculty.haas.berkeley.edu/borenste/download/atpcase1.pdf.

[22] https://www.justice.gov/atr/case-document/competitive-impact-statement-3.

[23] *Id.*

[24] *Id.*

Envelope# 29328052
Case# 1JC-18-1964

decree.[25]

54.     As presently situated, ATPCO continues to facilitate "coordinated interaction" by

Defendants. American, Delta, and United are still among the owners of ATPCO.[26] ATPCO

maintains a service called FareManager, which it describes as follows:

> ATPCO maintains a comprehensive worldwide database of more
> than 124 million fares, composed of public, private, and IATA
> data, for about 450 airlines. Our continued prominence in data
> collection means you can rely on our wealth of experience in
> collecting airline pricing information and providing support
> services to the global travel industry.
>
> Our online FareManager system allows our customers the ease
> and flexibility to create, modify, match, or cancel airfares in
> seconds. In addition to fare information, ATPCO processes related
> data such as Rule, Routing, Footnote, Reservation Booking
> Designator (RBD), Ticketing Fees, Carrier-Imposed (YQ/YR)
> Fees, Optional Services, and Branded Fares. ATPCO also built
> and supports complex products such as Negotiated Fares and Fare
> By Rule, which create private and dynamic fares.[27]

55.     ATPCO's FareManager program is intended to work in conjunction with its

Market View program. ATPCO describes the latter as allowing airlines to monitor and analyze

the fares of rivals and react accordingly:

> You can do that with Market View, an analysis tool that provides
> a comprehensive view of the market, including your own public
> and private and your competitors' public fares and rules data, Fare
> By Rule, and dynamically constructed fares in a multi-carrier
> display. ***With Market View, you can review market data then
> directly navigate to FareManager to change your airline's fares,***

---

[25] https://www.justice.gov/archive/atr/public/press_releases/2004/204933.pdf.

[26] http://www.atpco.net/atpco-owners.

[27] http://www.atpco.net/products/data-collection-and-input-services. Southwest pulled out of
ATPCO in 2001. http://usatoday30.usatoday.com/tech/news/2001-07-06-southwest-limits-
data.htm. However, in August of 2008--shortly before the commencement of the claimed
conspiracy--it once again began filing its fares with ATPCO.
http://www.cbsnews.com/news/southwest-filing-fares-in-atpco-once-again/.

18

> *rules, and footnotes, all within the same environment*. Market View is an easy-to-use tool that gives you the information you need to get the right price in the right market at the right time.[28]

(Emphases added).

56.     Thus, ATPCO still provides the Defendants with the means and ability to coordinate their passenger airfares, detect any cheating by a co-conspirator and take action to punish such cheating on a real-time basis.

57.     ***CMIs***. Another way to punish cheating is through the use of CMIs that can deter aggressive discounting and prevent fare wars. A CMI occurs where two or more airlines compete on multiple routes. If an airline offers discounted fares in one market, an affected competitor often responds with discounts in another market--a CMI--where the discounting airline prefers a higher fare. CMIs often cause an airline to withdraw fare discounts. The ATPCO consent decree cited above contained provisions meant to make it far more difficult to utilize such CMIs, but the practice has not come to an end, as reflected in the *U.S Airways* Complaint. An example given by DOJ in that complaint occurred in the fall of 2009. U.S. Airways lowered fares and relaxed restrictions on flights out of Detroit (a Delta stronghold) to Philadelphia. Delta responded by offering lower fares and relaxed restrictions from Boston to Washington (a U.S. Airways stronghold). U.S. Airways' team leader for pricing observed Delta's move and concluded that "[w]e have more to lose in BOSWAS . . . I think we need to bail on the [Detroit-Philadelphia] changes." U.S. Airways then "bailed."

58.     ***Prior Antitrust Actions Brought Against Airlines***. The conclusion that the structure in the airlines industry is conducive to collusion is borne out by the fact that airlines have been accused by both regulators and private parties on numerous occasions of engaging in

---

[28] http://www.atpco.net/products/fare-management/market-view.

Envelope# 29328052
Case# 1JC-18-1964

anticompetitive activities and have admitted liability or entered into significant settlements to avoid ongoing litigation.

59.     The DOJ's consent decree with respect to ATPCO and the allegations contained in the *U.S. Airways* Complaint have already been discussed. Similarly, since raids by law enforcement agencies around the world in 2006, 22 international airlines and 21 airline executives have pled guilty to participating in a conspiracy to fix the price of air cargo shipping services for shipments to and from the United States and paid fines totaling over $1.8 billion. *See In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1775 (JG)(VVP), 2009 WL 3443405, at *1 (E.D.N.Y. Aug. 21, 2009) (discussing guilty pleas by, and prosecutions against, various airlines); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1775 (JG)(VVP), 2015 WL 5093509 (E.D.N.Y. July 6, 2015) (approving latest in a number of settlements in follow-on private litigation).

60.     The DOJ has also prosecuted both domestic and international air carriers for antitrust violations in recent years. In addition to the prosecutions and guilty pleas in the Air Cargo matter, *see, e.g., United States v. American Airlines, Inc.*, 743 F.2d 1114 (5th Cir. 1984), *cert. denied*, 474 U.S. 1001 (1985) (reversing dismissal of complaint alleging attempted joint monopolization by American of flights out of the Dallas-Fort Worth hub); *United States v. Braniff Airways, Inc.*, 453 F.Supp. 724 (W.D. Tex. 1978) (declining to dismiss indictment alleging Braniff Airways and Texas International Airways engaged in price-fixing of airfares); *United States v. All Nippon Airways Co., Ltd.*, No. 10-Cr-00295- JD (D.D.C.) (guilty plea with respect to the fixing of certain Transpacific airfares; a district court recently denied summary judgment with respect to non-settling defendants in private follow-on litigation after $39.5 million in settlements had been achieved: *see In re Transpacific Air Transportation Antitrust*

20

*Litig.*, 69 F.Supp.3d 940 (N.D. Cal. 2014); *In re Transpacific Air Transportation Antitrust Litig.*, No. C 07-05634, 2015 WL 3396829 (N.D. Cal. May 26, 2015)): *United States v. Asiana Airlines, Inc.*, No. 1:09-cr-00099-JDB (D.D.C.) (plea agreement with respect to conspiracy to fix air passenger fares on Transpacific routes by Korean air passenger carriers; follow-on private litigation resulted in a class settlement of $50 million plus coupons: *see In re Korean Air Lines Co., Ltd. Antitrust Litig.*, No. CV 07-5107 SJO (AGRx), 2013 WL 7985367 (C.D. Cal. Dec. 23, 2013)); *United States v. British Airways PLC*, No. 07-183-JDB (D.D.C.) (guilty plea with respect to, *inter alia*, fixing of air passenger fares to and from the United Kingdom; follow-on private litigation resulted in a class settlement worth up to $196.4 million: *see In re Int'l Air Transport Antitrust Litig.*, 577 Fed. Appx. 711 (9th Cir. 2014)).

61.     Most recently, on November 10, 2015, the DOJ filed a civil antitrust suit against United and Delta in federal court in New Jersey, alleging that "United's planned acquisition [from Delta] of 24 takeoff and landing slots at Newark [Airport] would increase United's already dominant position at the airport, and would strengthen a barrier that diminishes the ability of other airlines to challenge United at the airport.  As a result, the 35 million air passengers who fly into and out of Newark every year likely would face higher fares and fewer choices."[29] As the DOJ's complaint points out, United's use of landing slots at Newark contributes to capacity reduction; United keeps idle as many as 82 slots per day, exceeding the number of slots available to all of its competitors at that facility. The DOJ's suit alleges, *inter alia*, a conspiracy between the two airlines in violation of Section 1 of the Sherman Act (15 U.S.C. §1).[30]

---

[29] http://www.justice.gov/opa/pr/justice-department-files-antitrust-lawsuit-block-uniteds-monopolization-takeoff-and-landing. The complaint is in the case of *United States v. United Continental Holdings, Inc., et al.*, No. 15-1384 (D.N.J.) and can be found at http://www.justice.gov/opa/file/792401/download.

[30] Baer of DOJ recently discussed this action in prepared testimony given before the

Envelope# 29328052
Case# 1JC-18-1964

62. With respect to private class litigation involving antitrust claims against the airlines, there have been several recent examples of note. In the 1990s, class suits were filed against numerous airlines (including American, Delta and United), alleging fixing of airfares throughout the United States. A nationwide class was certified. *In re Domestic Air Transportation Antitrust Litig.*, 137 F.R.D. 677 (N.D. Ga. 1991). The case eventually settled for $408 million. *In re Domestic Air Transportation Antitrust Litig.*, 148 F.R.D. 297 (N.D. Ga. 1992). In another case, Northwest Airlines, Delta and U.S. Airways were accused of colluding. Summary judgment was denied and a class was certified. *In re Northwest Airlines Corp.*, 208 F.R.D. 174 (D. Minn.), *aff'd sub nom. In re Delta Air Lines, Inc.*, 310 F.3d 953 (8th Cir. 2002), *cert. denied sub nom. Northwest Airlines Corp. v. Chase*, 539 U.S. 904 (2003).

## B. ECONOMIC AND OTHER EVIDENCE SUPPORTS THE CONCLUSION THAT DEFENDANTS HAVE PRICED DOMESTIC AIRFARES DIFFERENTLY FROM THE REST OF THE INDUSTRY AND EARNED HUGE PROFITS AS A RESULT.

63. Economic evidence, as well as publicly available evidence, support the conclusion that the four Defendants (and U.S. Airways before it was absorbed by American) priced airfares at higher levels than other domestic air passenger carriers during the period from 2009 to the present, despite the occurrence of substantial declines in jet fuel costs during 2009 and again in 2014-16. As a result, they have earned huge profits.

64. *Average Airfares and The Lack of Competitive Pricing on Various Routes*. The chart below shows the average fare per city-pair route charged by the largest carrier on that route from January of 2003 through August of 2015. It demonstrates that, until January of 2009, the average fare per route when the largest carrier was a Defendant was comparable to the average

---

Subcommittee on Antitrust, Competition Policy and Consumer Rights of the Judiciary Committee of the United States Senate on March 9, 2016. https://www.judiciary.senate.gov/imo/media/doc/03-09-16%20Baer%20Testimony.pdf.

22

Envelope# 29328052
Case# 1JC-18-1964

fare per route when the largest carrier was not a Defendant. However, beginning in January of 2009, the average fare per route charged by the largest carrier on a route when that carrier was one of the Defendants diverged from and was increasingly greater than the average fare charged by the largest carrier on a city-pair route when that carrier was not one of the Defendants.



65.   The Defendants' airfares were consistently and significantly more expensive than the air fares of non-Defendant airlines beginning in 2009. The chart below shows that, before January of 2009, airfares for both Defendants and non-Defendants grew by approximately the same percentage on the city-pair routes where each respective carrier was the largest carrier. However, beginning in January of 2009, there is a drastic difference between the Defendants' airfares when one of them was the largest carrier on a route and the non-Defendants' air fares when when one of them was the largest carrier on a route.  Plaintiffs allege that this pattern of

Envelope# 29328052
Case# 1JC-18-1964

increased airfares by Defendants was not the product of individual conduct, but was instead the result of collusive action by the Defendants (and U.S. Airways, prior to its merger with American) to increase or stabilize airfares by, *inter alia*, an agreement to reduce airline capacity.



66. Since the operations of the Defendants and other airlines were subject to the same conditions in the United States, the increasing divergence in airfares after January of 2009 implies that the Defendants engaged in behavior significantly different than the behavior of the other United States air passenger carriers.

67. This conclusion is bolstered by other evidence as well. As depicted below, the United States Producer Price Index for domestic airfares shows an increasing trend in prices for such airfares from 2009 to January of 2016:

24



68.     As a specific example, one casualty of the merger between American and U.S. Airways was the latter's Advantage Fares program, which offered significant discounts on connecting flights.[31] Pursuant to the program, price sensitive customers could get discounted fares, especially for last minute bookings. The DOJ in the *U.S. Airways* Complaint compared fares for a trip from Houston to New York City on August 13, with a return trip on August 14. U.S. Airways offered a one-stop fare from $575, while the prices for United, Delta and American were from $1331, $1467 and $1467, respectively.

69.     Defendants often charge identical or nearly identical airfares on various routes, a practice facilitated by the use of ATPCO. On July 2, 2015, McClatchyDC published an article

---

[31] http://marketrealist.com/2014/07/overview-impact-eliminating-advantage-fare-program/.

25

Envelope# 29328052
Case# 1JC-18-1964

comparing airfares for various flights:

> For example, tickets for nonstop flights to five destinations served by two competing carriers from Charlotte Douglas International Airport in North Carolina are largely identical.
>
> – A round-trip economy class ticket from Charlotte to Chicago O'Hare, departing on Sept. 9 and returning Sept. 14, costs $252 on both United and American.
>
> – An economy round-trip ticket from Charlotte to Houston Intercontinental on those days costs $327 on those same two carriers.
>
> – An economy round trip on American and Delta from Charlotte to Detroit Metropolitan on those same days costs $350.
>
> – A round-trip flight from Charlotte to New York's LaGuardia airport costs $220 on American and Delta, while a round trip from Charlotte to Newark Liberty on the same days costs $199 on American and United.[32]

70.     The AAI did its own analysis of fare increases in the aforementioned letter to the DOJ.[33] It found that average real fares across airline hubs declined by 12% from 2004-09, even though fuel costs increased by 33% during the same period. All of that changed in the 2009-14 period:

> From 2009–2014, for example, the increase in average fares across hubs was 15%. This rate of growth far outstripped that of fuel costs, which slowed to less than 5% over the second period.
>
> Indeed, four of the five years from 2009–2014 were marked by flat or declining fuel costs for the Big 4. By 2014, operating margins had increased to 8.6% and the airlines were strongly profitable. This second period includes the three mergers of United-Continental, Southwest-AirTran, and U.S. Airways-American. Significantly higher fares and slower rates of increase

---

[32] http://www.mcclatchydc.com/news/nation-world/national/economy/article26083942.html.

[33] http://www.antitrustinstitute.org/sites/default/files/Letter%20to%20DOJ_Collusion%20Probe_F.pdf.

Envelope# 29328052
Case# 1JC-18-1964

in fuel costs, and strong return to profitability marked this phase.[34]

71.    Southwest used to be regarded as a price-cutter in some regions but that is no

longer true. An October 18, 2012 *Associated Press* article makes this point:

> While Southwest rolls out the occasional sale to fill planes -- they were 82.1 percent full, a record for the quarter -- it has also been aggressive about trying to raise fares in recent months.
>
> It launched two of the three fare increases that stuck during the quarter, according to a tally by Rick Seaney, CEO of air-travel website FareCompare.com.
>
> And when an attempted increase by United Airlines last week faltered, Southwest came along and revived it. Seaney wrote that it was the first time he remembers a low-cost airline reviving a failed domestic price hike in almost a decade of watching fares.[35]

72.    There has also increasingly been less head-to-head competition among the

Defendants. Associated Press has documented this point in a July 14, 2015 article:

> "Airlines aren't going at each other like they used to," said Mike Boyd, an aviation consultant frequently hired by airports. "They have their turf, and they very rarely go to the mattresses with one another."
>
> At 40 of the 100 largest U.S. airports, a single airline controls a majority of the market, as measured by the number of seats for sale, up from 34 airports a decade earlier. At 93 of the top 100, one or two airlines control a majority of the seats, an increase from 78 airports, according to AP's analysis of data from Diio, an airline-schedule tracking service.
>
> . . . .
>
> Still, "the airline industry is less competitive now than it used to be," said Seth Kaplan, managing partner of industry newsletter Airline Weekly. "Some of us used to have eight or nine airlines to choose from. Now we have maybe four or five, just as we have four or five cellphone companies to choose from."

---

[34] *Id.*

[35] http://www.cleveland.com/business/index.ssf/2012/10/southwest_airlines_posts_small.html.

Envelope# 29328052
Case# 1JC-18-1964

The mergers have altered the competitive landscape at airports big and small.

— In Indianapolis, the two leading airlines controlled just 37 percent of the seats a decade ago, and domestic fares were 9 percent below the national average. Then the city's main airline, ATA, went bankrupt and was bought by Southwest, and its No. 2 carrier, Northwest, was absorbed by Delta. Now two airlines control 56 percent of the seats, and airfares are 6 percent above the national average.

— The Dayton, Ohio, airport was served by 10 airlines in 2005, and fares were 5 percent below average. Today, just four airlines fly there and prices are almost 10 percent above average.

— Big hub airports aren't immune. In 2005, U.S. Airways controlled nearly 66 percent of the seats in Philadelphia. Now that U.S. Airways has merged with American, the combined airline has 77 percent of the seats. Airfare has gone from 4 percent below average to 10 percent above it.

— Delta's hold on Atlanta, the world's busiest airport, increased during that same period from 78 percent of seats to just over 80 percent. At the same time, low-cost AirTran merged into Southwest and reduced flights there. Domestic airfares at the airport went from nearly 6 percent below average to 11 percent above.[36]

73. **Demand**. Increases in airfares by Defendants are not explained by huge increases in demand. The chart below shows that demand (measured by the daily number of passengers by route), after substantially increasing from 2003 to 2008, fell during 2008-09, remained steady in 2010-11, increased slightly but remained steady from 2011 to 2013, and then increased. As a matter of economics, all other things equal, falling demand would lead to falling prices and steady demand would lead to prices that do not change.

---

[36] http://bigstory.ap.org/article/7f964b3e484d4b43b732424dd9df0975/airlines-carve-us-markets-dominated-1-or-2-carriers.

Envelope# 29328052
Case# 1JC-18-1964



Source: Department of Transportation

74. **_Jet Fuel Prices_**. Increases in airfares by Defendants are also not explained by increased costs for jet fuel. The Energy Information Administration ("EIA") maintains historical price data on United States Gulf Coast Kerosene-Type Jet Fuel Spot Prices FOB.[37] That data indicates that the price of jet fuel spiked in September of 2008 at $3.91 per gallon and then plummeted precipitously, reaching a trough of a $1.19 per gallon in March of 2009. The price of jet fuel has never since reached the 2008 peak. By August of 2014, it was at $2.82 per gallon, but thereafter, it declined precipitously, reaching 91 cents per gallon by January of 2016. The following chart, taken from the EIA's website, depicts all of this.

---

[37] https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=EER_EPJK_PF4_RGC_DPG&f=D.

29

Envelope# 29328052
Case# 1JC-18-1964



**U.S. Gulf Coast Kerosene-Type Jet Fuel Spot Price FOB, Daily**

75. Given that jet fuel is a major cost input in the operation of air passenger transportation services, one would have expected that these jet fuel price developments would have resulted in lower airfares charged by the Defendants. That did not happen. The pricing behavior of the non-Defendant carriers was consistent with competitive behavior, whereas the pricing behavior of the Defendants was consistent with collusion.

76. ***Load Factors***. Load factor (measured as revenue passenger miles divided by available seat miles or "ASMs")[38] is a measurement typically used by airlines to track capacity utilization. From 2005 through 2008, Defendants' annual load factors averaged approximately 80% during a time of substantially increasing demand. From 2009 through 2014, Defendants' annual load factors increased to an average of approximately 84% during a time of decreasing

---

[38] The term ASM is a common measurement of airline output that refers to one aircraft seat flown one mile, whether occupied or not. It is often considered in conjunction with "revenue passenger miles" ("RPM"), a term denoting how many of an airline's available seats are actually sold. Dividing RPMs by ASMs yields the "load factor", either on a particular flight or for the entire air passenger transportation system. ASMs are also used in calculating "Revenue per Available Seat Mile" ("RASM"), a figure calculated by dividing an airline's total seat revenue by its ASM. *See* http://web.mit.edu/airlinedata/www/Res_Glossary.html

Envelope# 29328052
Case# 1JC-18-1964

and steady demand and lower costs. That increase in capacity utilization is inconsistent with economic theory absent collusion.

77.     The AAI, in the aforementioned letter to the DOJ that raised concerns over "coordinated conduct" in the airline industry, noted that the domestic load factor for the Big Four airlines increased from 76% in 2004 to 86% in 2014.[39] In its view, the airlines' "capacity discipline" strategy--discussed in detail below-- served this goal. Recognizing that despite the public nature of the statements quoted above, the Defendants clearly were talking to each other, the AAI remarked, "***a CEO that says he or she will hold capacity increases to 2%, so long as others do, has potentially solicited collusive behavior. The conditionality of such a capacity strategy also exceeds the bounds of normal business behavior***."[40] (Emphases added).

78.     ***Ancillary Fees***. In addition to higher airfares, Defendants have collectively "unbundle" charges that often had not previously been assessed separately and charge new or increased fees for services that traditionally were part of the services that passengers expected when purchasing an airline ticket. Among the new fees are fees for the first and second checked bags, cancellations of tickets, seat selections, blankets and pillows, carry-on bags, reservations made over the phone  or in person (as opposed to those made over the internet), and in-flight food and beverages.  Revenue attributable to most of these fees is a relatively small part of overall revenue, with the exception of baggage and cancellation charges, which are the most common and the largest of the new fees in terms of revenue. As depicted below, revenue from these two sources, which have become increasingly important contributors to airlines' bottom lines, grew from $1.4 billion in 2007 to more than $6.5 billion in 2014:

---

[39] http://www.antitrustinstitute.org/sites/default/files/Letter%20to%20DOJ_Collusion%20Probe_ F.pdf.

[40] *Id*.

Envelope# 29328052
Case# 1JC-18-1964





Source: Bureau of Transportation Statistics

79. The AAI in its aforementioned letter to DOJ had also expressed serious concerns about the Defendants' possible collusive imposition of ancillary fees (and their potential coordination through IATA on such matters), as well as their efforts to limit data available to online travel services.[41]

---

[41] http://www.antitrustinstitute.org/sites/default/files/Letter%20to%20DOJ_Collusion%20Probe _F.pdf.

Envelope# 29328052
Case# 1JC-18-1964

80. *Defendants' Profits*. Given all of these developments, the Defendants have

earned record profits in recent years. As *Forbes* noted in May of 2015:

> The year 2015 began on an optimistic note for the US airline
> industry as the major airlines - American Airlines, United
> Continental Holdings, Delta Air Lines, Alaska Air Group,
> Southwest Airlines, and JetBlue Airways - posted consolidated net
> income of over $3 billion during the first quarter. The
> performance was particularly striking as the first quarter has
> traditionally been the weakest quarter for the industry due to
> seasonal fluctuations. The major reason behind the sudden surge
> in the industry's profitability was the plummeting crude oil prices
> over the last nine months. Other factors that influenced the
> industry's performance included capacity restraint and the
> strengthening of the US dollar against other currencies.
>
> Most of the airlines either matched or exceeded the consensus
> earnings estimate for the March quarter. Delta initiated the
> earning season with its remarkable profits of $746 million in the
> quarter - almost thrice the profit earned a year ago – making it the
> best first quarter for the airline. American, the world's largest
> airline in terms of traffic, posted whopping profits of $932 million
> on the back of fuel cost savings of $1.2 billion during the quarter.
> United earned a profit of $508 million in the latest quarter -
> beating the consensus estimate by more than $0.08 per share – an
> improvement of $1 billion over the loss of $609 million incurred
> in the same quarter last year.[42]

IATA predicted net after-tax profits for North American airlines of $13.2 billion, which would

have exceeded the previous peak reached in the 1990s.[43]

81. These predictions turned out to be conservative. Notwithstanding some short-

lived price reductions after the DOJ issued CIDs to the Defendants (as discussed below), the *New

York Times* reported in a February 6, 2016 article that the Defendants earned a record $22 billion

in net income in 2015: $7.6 billion for American, $4.6 billion for Delta, $2.2 billion for

---

[42] http://www.forbes.com/sites/greatspeculations/2015/05/13/why-did-us-airlines-deliver-record-profits-in-the-seasonally-weak-first-quarter/#197922e81f88.

[43] https://www.iata.org/whatwedo/Documents/economics/Economic-Performance-of-the-Airline-Industry-mid-year-2015-forecast-slides.pdf.

Southwest, and $7.3 billion for United.[44] The article quoted Ed Bastian ("Bastian"), the President of Delta, as saying "[t]his is a period of good health like we have never seen before….We will want to stay disciplined to make sure we don't repeat the errors of the past." A January 19, 2016 article in *Air Transport World* cited Delta's CEO, Richard Anderson ("Anderson") as telling analysts that the company's financial success was due to "capacity discipline" and he predicted a profit margin of 18-20% in the first quarter of this year.[45] That prediction was a safe bet; by early January of 2016, Delta had successfully led the first airfare price increase of 2016, which was followed by the other Defendants and which led to an increase on average of $3 on domestic flights.[46]

82.     A factor responsible in part for the high profits has been the decline in jet fuel prices discussed above. "It's wonderful that fuel has run down–we love it. There's a $2 billion opportunity out there if we hold fare levels constant."[47] This could only be accomplished by the Defendants as a group if they were acting cooperatively and in unison. Anderson's view was that there was a new breed of executive in charge at the Defendant airlines. As he said in a December 2011 Delta Investor Day presentation:

> Most importantly the management I believe in the industry in the US and really around the world ***has transformed from management that grew up in a regulated environment to management that is focused on a return on capital and so we're running a rational industry***.[48]

---

[44]  http://www.nytimes.com/2016/02/07/business/energy-environment/airlines-reap-record-profits-and-passengers-get-peanuts.html?_r=0.

[45] http://atwonline.com/finance-data/delta-air-lines-posts-45-billion-2015-net-profit.

[46]  http://seekingalpha.com/article/3797886-2016s-first-airline-fare-hike-takes.

[47] http://qz.com/324981/the-airline-executives-standing-between-you-and-cheap-plane-tickets/.

[48] Thomson Reuters StreetViews, Edited Transcript of DAL Delta Air Lines, Inc. Investor Say at 2 (Dec. 14, 2011).

Envelope# 29328052
Case# 1JC-18-1964

83.     Industry analysts and others concur. "The idea that U.S. airlines would, once again, devolve into a war for market share is founded on a misunderstanding of the new structure of U.S. airlines," Vinay Bhaskara, an industry analyst, wrote in *Airways News*.[49] He added that "[r]emember, this is the same management group that (instead of allowing passengers to reap a modest reduction in fares) responded to the F.A.A.'s inability to collect taxes in mid-2011 by gleefully raising base fares to where total out-of-pocket costs were exactly the same (earning a windfall of $28.5 million per day)."[50] United States Senator Charles E. Schumer ("Schumer") has echoed this point, stating in December of 2014 that "[a]t a time when the cost of fuel is plummeting and profits are rising, it is curious and confounding that ticket prices are sky-high and defying economic gravity....The industry often raises prices in a flash when oil prices spike, yet they appear not to be adjusting for the historic decline in the cost of fuel; ticket prices should not shoot up like a rocket and come down like a feather."[51]

### C.  CAPACITY AND PRICING IN THE AIRLINE INDUSTRY PRIOR TO 2009

84.     The foregoing allegations should be viewed in the context of how the major domestic air carriers competed prior to 2009 and how they acted with respect to increasing capacity.

85.     In enacting the Airline Deregulation Act of 1978, Congress "plac[ed] maximum reliance on competitive market forces and on actual and potential competition" in the air transportation industry. 49 U.S.C. §40101 (a)(6). For decades, that purpose was largely served;

---

[49] http://www.nytimes.com/2015/03/24/business/dealbook/as-oil-prices-fall-air-fares-still-stay-high.html.

[50] *Id.*

[51] *Id.*

Envelope# 29328052
Case# 1JC-18-1964

there were recurring price wars over domestic air passenger fares, constant increases in airline capacity (as measured by available seat miles), and vigorous price competition.[52]

86.     IATA, to which American, Delta and United all belong, preached the gospel of capacity discipline. As early as September of 2003, Giovanni Bisignani ("Bisignani"), the former Executive Director of IATA, told its members in Montreal that "[c]apacity control is also a key issue" and that ***"[t]oo often in the past, our industry has been focused on market share at the expense of profitability***."[53]  (Emphases added). Bisignani repeated this theme in a 2006 speech delivered in Paris: "[l]et's start at home. Sometimes we have been our own worst enemy— chasing growth instead of profitability. As discussed, we changed after 2001. But let's be frank. We are now benefiting from a strong global economy. And record aircraft orders could be our Achilles heel ***if we stop managing capacity carefully***."[54]  (Emphases added). Similarly, Bisignani said in a June 2010 speech delivered in Berlin that one of the risks facing the industry was "excess capacity"; "***[t]he discipline of chasing profits, not market share, is the only way to protect the bottom line***."[55]  (Emphases added).

87.     After the economic crash of 2008, the members of the industry became very

---

[52] The price competition that occurred is documented in the economic literature. *See, e.g.,* Megan Busse, "Firm financial condition and airline price," 33 RAND J. of Econ. 298 (Summer 2002) (http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.164.6100&rep=rep1&type=pdf); Steven Morrison & Clifford Winston, "Causes and Consequences of Airline Fare Wars" (1996) (http://www.brookings.edu/~/media/Projects/BPEA/1996-micro/1996_bpeamicro_ morrison. PDF).

[53] http://www.iata.org/pressroom/speeches/Pages/2003-09-09-02.aspx.

[54] http://www.iata.org/pressroom/speeches/Pages/2006-06-05-01.aspx.

[55] http://www.logisticsmgmt.com/article/air_cargo_global_logistics_iata_issues_promising_ forecast.

Envelope# 29328052
Case# 1JC-18-1964

receptive to the message of "capacity discipline." When the economy improved in 2009 and jet

fuel prices declined precipitously, the question arose whether the industry would return to its

former ways of adding airline capacity and decreasing fares. As explained below, the members

of the industry made a conscious, joint decision not to do so. In the words of former United CEO

Jeff Smisek ("Smisek"), in January of 2015, "[t]he U.S. airline industry has transformed itself

over the last several years through consolidation and capacity discipline…."[56] This Complaint

alleges the consolidation aspect above. The next section discusses Defendants' agreement to

exercise capacity discipline from 2009 to the present. Defendants recognized that there had to be

joint discipline and assured each other that capacity discipline would be maintained.

### D. "CAPACITY DISCIPLINE" DURING 2009-15

88. Consensual capacity reduction among United States airlines commenced in 2009.

Various statements by Defendants' executives in 2009 emphasized that this "capacity discipline"

had to be exercised collectively by industry members.  As John Tague ("Tague"), President of

United, said in a third quarter 2009 earnings call, "without the level of ***capacity discipline that***

***we have led and most people in the industry have participated in***, this would be a very, very

dire time. ***So we're going to have to keep our lid on capacity going forward, and we certainly***

***maintain our commitment to be extremely responsible in that area***."[57] (Emphases added).

Similarly, in a March 2009 industry summit hosted by Thomson Reuters, United's Senior Vice-

President and CFO, Kathryn Mikells ("Mikells"), stated that "***first and foremost, I think***

---

[56] http://seekingalpha.com/article/3097576-united-continentals-ual-ceo-jeff-smisek-on-q1-2015-results-earnings-call-transcript?part=single.

[57] http://seekingalpha.com/article/167725-ual-corporation-q3-2009-qtr-end-9-30-09-earnings-call-transcript?part=single.

Envelope# 29328052
Case# 1JC-18-1964

*capacity discipline is what the industry needs*."[58] (Emphases added). Likewise, on March 10, 2009, at an industry conference hosted by J.P. Morgan, Mikells reported: "*[w]hile fuel prices have declined, the industry is continuing to exhibit the capacity discipline that we need in order to deal with the global recession we now face.*"[59] (Emphases added). Bastian of Delta, who attended this conference, added that Delta was focused on "*our industry leading position with respect to capacity discipline*."[60] (Emphases added). Southwest's Kelly stated at the same conference that "[w]e are reducing our capacity . . . our schedule reductions were in effect as of January."[61] And Tom Horton ("Horton"), CFO and Executive Vice-President of Finance & Planning for American, said during an earnings call held in July of 2009 that "last month we announced further capacity reductions, beyond what was a very conservative plan, further demonstrating our capacity discipline."[62] Bastian, in a statement made in December of 2009, added that "*[o]ne of the things that's going to be important for us as an industry is maintaining industry discipline with respect to capacity*."[63] (Emphases added). Similarly, at a December 2009 Morgan Stanley conference, Hank Halter ("Halter"), the Chief Financial Officer ("CFO") of Delta, stated that "*[t]he challenge for the airline industry is right now we're*

---

[58] Thomson StreetEvents, Final Transcript of UAUA-UAL Corporation at Thomson Reuters Travel and Leisure Summit at 2 (March 3, 2009).

[59] Thomson StreetEvents, Final Transcript of UAUA-UAL Corporation at J.P Morgan Aviation & Transportation Conference at 2 (March 10, 2009).

[60] Thomson StreetEvents, Final Transcript of DAL Delta Air Lines, Inc. at J.P. Morgan Aviation & Transportation Conference at 2 (March 10, 2009).

[61] Thomson StreetEvents, Final Transcript of LUV Southwest Airlines at J.P. Morgan Aviation & Transportation Conference at 4 (March 10, 2009).

[62] Thomson StreetEvents, AMR Q2 2009 AMR Corporation Earnings Conference Call at 3 (July 15, 2009).

[63] Thomson StreetEvents, Final Transcript of DAL Delta Air Lines, Inc. Investor Day at 7 (Dec. 15, 2009).

Envelope# 29328052
Case# 1JC-18-1964

*maintaining capacity discipline. I think all the airlines collectively have pulled down their capacity and have been very disciplined.*"[64] (Emphases added). United States airlines reduced capacity by 10% in 2009.[65]

89.　　The industry's new approach was reflected in statements made by Defendants' executives at the Bank of America Merrill Lynch Investment Conference in June of 2010, around the time that United and Continental Airlines announced their merger. The following article described what happened at this conference:

> *The consensus among airline executives is that the industry will exercise "capacity discipline" by resisting the temptation to re-insert seats in markets that show strengthening demand.* Should the industry exhibit such behavior, it likely would mean more crowded airplanes and could provide carriers the impetus to raise fares and an opportunity to take another run at sustained profitability.
>
> "The No. 1 question I get from investors is, 'Is it different this time, or is the industry going to do what it has always done in the past and start growing again?'" said U.S. Airways president Scott Kirby [("Kirby")], speaking this week at a Bank of America investment conference. "*I think it is different this time--and I know you should always be careful when saying that because any time you say that about anything it's rarely different--but it feels different this time for good rational reasons.*"
>
> Most importantly, Kirby said, is that the entire industry--including low-cost carriers--"recognizes that we are a mature industry. This isn't a growth industry any more. It's hard to rationalize all the capacity that exists today, and it's even harder to rationalize new capacity on a going-forward basis. It is hard to justify buying new airplanes when you know that fuel could go back to $150 a barrel.
>
> *"The industry, by and large, has CEOs with different views than the CEOs of yesteryear," Kirby continued. "They are much more focused on returns and financial performance than they*

---

[64] Thomson StreetEvents, Final Transcript of Delta Air Lines, Inc. at Morgan Stanley Transportation Corporate Access Day at 8 (Dec. 2, 2009).

[65] http://www.fundatia-aleg.ro/module-pagesetter-viewpub-tid-28-pid-4338.phtml.

Envelope# 29328052
Case# 1JC-18-1964

*are on empire building, 'how big is my airline, what is my market share, how many cities do I fly to,' etc. Things can change in a hurry, but I don't think rapid capacity growth is going to become a problem in this industry, at least for the foreseeable future."*

Speaking at the same conference, Delta Air Lines president Ed Bastian also cited capacity discipline, volatile fuel prices and management focus on shareholder value. "You have companies that have gone through the bankruptcy process and are highly sensitized to generating and delivering the kind of return that is required," he said. *Bastian also predicted that industry consolidation would progress, "allowing us to manage the overall capacity levels in a better way. You'll see the alliances deliver that same discipline from an international standpoint."*

American Airlines CEO Gerard Arpey [("Arpey")] agreed that the proposed United-Continental merger "will allow for one fewer choice in the marketplace and should contribute to a more rational balance between supply and demand.

"If we assume the current economic recovery has legs, *then I think as an industry we are much better positioned to leverage the upturn than we have been in previous recoveries*," Arpey continued. "There are far fewer seats for sale in the marketplace today than there were five years ago. *There are also hopeful signs that the industry has learned its lesson about keeping capacity growth in line with demand--and will continue to apply that lesson even as the economy comes back*."

Last month, J.P. Morgan analysts expressed sentiments similar to those shared this week by airline leaders. "Management composition appears stronger to us today than at any time in the past," they wrote in a May 25 research note. …. *While always dangerous to proclaim 'It's different this time,' the fact of the matter is that, by all fundamental measures, it appears to us to be true."*[66]

(Emphases added).

90.     Thus, the Defendants' executives indicated they were breaking away from past competitive practices and were entering a new era of "capacity discipline," a new era that they

---

[66] *Id*. (Emphases added).

predicted confidently would continue, despite fuel price declines and an upturn in the economy. They repeatedly emphasized that this was an important development for the United States airline industry as a whole (primarily the four Defendant airlines and U.S. Airways prior to its merger with American, which comprise approximately 80% of the market).

91.     This emphasis also was reiterated in other earnings call and conference presentations by Defendants' executives in 2010. For example, in a January 27, 2010 earnings call, United's Tague stated that "[a]t United, *we firmly believe that the only way the industry can fully recover and meet its financial targets is through capacity discipline*….For a number of years our view has been that ultimately *capacity discipline forms the essential foundation for revenue improvement and the return of industry profitability*."[67] (Emphases added). Similarly, on February 23, 2010, Mikells said at an industry summit hosted by Thomson Reuters that *"[w]hat we have seen so far is I think very good overall behavior in terms of capacity discipline on the part of the industry*."[68] (Emphases added). At the same summit, Laura Wright ("Wright"), Southwest's CFO and Senior Vice-President of Finance, agreed, stating that "[n]o *question, if there's a lot of capacity discipline in the market, that will -- that should help yields as well*."[69] (Emphases added). And Derrick Kerr ("Kerr"), CFO of U.S. Airways (later Executive Vice-President and CFO of American after the latter acquired U.S. Airways), said on a third quarter 2010 earnings call that "*continued industry capacity discipline led to improved revenue*

---

[67] http://seekingalpha.com/article/184919-ual-corporation-q4-2009-earnings-call-transcript?part=single.

[68] Thomson StreetEvents, Final Transcript of UAUA-UAL Corporation at Thomson Reuters Travel and Leisure Summit at 3 (Feb. 23, 2010).

[69] Thomson StreetEvents, Final Transcript of Southwest Airlines at Thomson Reuters Travel and Leisure Summit at 4 (Feb. 23, 2010).

Envelope# 29328052
Case# 1JC-18-1964

*performance*."[70] (Emphases added). The following month, at an industry conference, Kerr said that "*[c]apacity discipline has been a huge thing for us, a huge thing for the industry….*"[71] (Emphases added). Kirby of U.S. Airways agreed at another industry conference during the same month, crediting "capacity discipline . . . across the industry" for the industry's success in 2009. He went on to add:

> *And then, finally, the industry capacity outlook I think is benign. Capacity discipline remains intact. You've got to be careful about saying it's different this time because it rarely is when people say that. I really do think it's different this time and that industry capacity is going to remain in check…. Changes in leadership at airlines for airline CEOs, really, across the board or almost across the board being much more financially focused as opposed to market share driven, all of which, I think, means we will see continued capacity discipline going forward and something, by the way, that the industry clearly needs*.[72]

(Emphases added).

     92.    On March 9, 2010, there was a J.P. Morgan aviation, transportation and defense conference was held, at which executives of most of the Defendants were in attendance. United's Mikells stated that "*[w]e've been clearly an industry leader and have long been preaching the need across the industry for capacity discipline. I've been very encouraged by what I've seen thus far*. *And I think unlike some other points in the past, there's a lot of pragmatic reasons to be encouraged about capacity discipline as we enter this recovery period*."[73] (Emphases added).

---

[70] Thomson StreetEvents, Final Transcript of Q3 U.S. Airways Earnings Conference Call at 3 (Oct. 20, 2010).

[71] Thomson StreetEvents, Final Transcript of U.S. Airways at Citigroup North America Credit Conference at 2 (Nov. 17, 2010).

[72] Thomson StreetEvents, Final Transcript of U.S. Airways at Hudson Securities U.S. Airlines Conference at 4 (Dec. 8, 2010).

[73] Thomson StreetEvents, Final Transcript of UAUA-UAL Corporation at J.P. Morgan Aviation, Transportation & Defense Conference at 4 (March 9, 2010).

42

American's Horton, agreed, stating that "*we have been the industry leader in exercising capacity discipline*" and "*much of the industry followed our lead….All told, when measured against 2007, 2009 mainline domestic capacity for the network carriers was down a whopping 14.5%.*"[74] Delta's Bastian sounded a similar theme, saying "our system capacity is down between--will be down for the quarter between 4% and 5%, *continuing to maintain that level of capacity, discipline and restraint we told you is important for managing recovery, not just for our business but of the industry*."[75] (Emphases added).

93.     Similarly, in an April 2010 earnings call, American's Arpey noted that "network carriers' capacity is down about 12% from the first quarter of 2008."[76] In that same month, United's Tague was quoted as saying that "*we firmly believe that the only way the industry can fully recover and meet its financial target is through capacity discipline*."[77] (Emphases added).

94.     At the Bank of America Merrill Lynch investment conference held in June of 2010 and described in the article quoted above, American's Arpey extolled the convergence of views among the major domestic air passenger carriers, framing his opinion carefully because of "antitrust reasons":

> Well, that phenomenon that I described, that convergence -- and I think it will do exactly as you suggest -- I don't think that's bad for the industry or bad for returns. I think it's good for the industry because input costs will be more aligned across the network carriers. *And if that's the case, then the -- I'll be careful, for*

---

[74] Thomson StreetEvents, Final Transcript of AMR AMR Corporation at J.P. Morgan Aviation, Transportation & Defense Conference at 2, 4 (March 9, 2010).

[75] Thomson StreetEvents, Final Transcript of DAL Delta Air Lines, Inc. at J.P. Morgan Aviation, Transportation & Defense Conference at 6 (March 9, 2010).

[76] http://seekingalpha.com/article/200030-amr-corp-q1-2010-earnings-call-transcript?part=single.

[77] http://seekingalpha.com/article/201216-ual-corporation-q1-2010-earnings-call-transcript?part=single.

Envelope# 29328052
Case# 1JC-18-1964

> *antitrust reasons, how I phrase this. Then if your input costs are looking alike, then your motivation in terms of how much revenue that you need to produce to get a return for your shareholders will be more consistent. And I think that will be healthy for the industry*.[78]

(Emphases added). Or, as Bastian of Delta said at the same conference, "***we are doing our share at maintaining the overall discipline across our structure and we would expect our competitors hopefully to do the same***."[79] (Emphases added). Mikells of United said at the same conference that "***[c]apacity discipline is clearly key to improving the economics of our business and United has clearly been a leader***."[80] (Emphases added). And U.S. Airways' Kirby stated at this conference that "[t]he capacity cuts are in place and no sign of reversing anytime in the foreseeable future . . . . ***And really, it's a fundamental change to the pricing structure and the model.***" (Emphases added).[81]

95.  The mantra of capacity discipline by Defendants was reiterated in 2011. On February 3, 2011, at a Raymond James industry conference, Delta's Bastian stated that "***we've been pretty successful as an industry with respect to maintaining price discipline. We've put through four price increases over the last 45 days, and there's another one in the market.***"[82] (Emphases added). On March 22, 2011, at an industry conference hosted by J.P. Morgan, and attended by executives from all four Defendants, Smisek of United reported that "***we [airlines]***

---

[78] Thomson StreetEvents, Final Transcript of AMR AMR Corporation at Bank of America Merrill Lynch Investment Conference at 9 (June 15, 2010).

[79] Thomson StreetEvents, Final Transcript of DAL Delta Air Lines, Inc. at Bank of America Merrill Lynch Investment Conference at 9 (June 15, 2010).

[80] Thomson StreetEvents, Final Transcript of UAUA-UAL Corporation at Bank of America Merrill Lynch Investment Conference at 9 (June 15, 2010).

[81] Thomson StreetEvents, Final Transcript of U.S. Airways at Bank of America and Merrill Lynch Global Transportation Conference at 2 (June 11, 2009).

[82] Thomson StreetEvents, Final Transcript of DAL Delta Air Lines, Inc. at Raymond James Growth Airline Conference at 4 (Feb. 3, 2011).

Envelope# 29328052
Case# 1JC-18-1964

*have raised prices and we have had a round of price increases that has been faster than I have*

*seen in the 16 years in the business. I think that speaks volumes [about] . . . capacity*

*discipline*."[83] (Emphases added). Delta's Bastian, who was in attendance at the same

conference, added that "*[w]e have seen an unprecedented level of pricing discipline within the*

*industry*."[84] (Emphases added).

96. In September of 2011, senior executives of each of the Defendants openly

exchanged information about their current and future intentions to limit capacity at a Deutsche

Bank conference. The *Wall Street Journal* reported on what was said:

> Speaking at a Deutsche Bank investor conference, airline
> executives provided the first guidance that capacity cuts already
> planned for the fall would continue into next year.
>
> Ed Bastian, the president of Delta, the second-largest airline by
> traffic, said the airline will extend its planned 4% to 5% fourth-
> quarter cut in capacity into the first quarter of 2012. The airline
> plans to cut capacity by 2% to 3% for all of 2012, compared with
> 2011.
>
> Jeff Smisek, United's chairman and chief executive, said the
> carrier next year will keep consolidated capacity, which includes
> its mainline flights and those outsourced to regional partners, in
> line with 2011 levels. The largest U.S. carrier by traffic plans to
> offset a "modest decrease" in domestic traffic next year with an
> increase in international flying, Mr. Smisek said, boosted by the
> expected arrival of the first six of its delayed Boeing Co. 787
> Dreamliners.
>
> At the event, Southwest Chief Financial Officer Laura Wright said
> the airline, the largest carrier of domestic passengers, would keep
> capacity flat "or slightly down" next year.
>
> Meanwhile, Beverly Goulet, vice president and treasurer of
> American Airlines parent AMR Corp., said American will reduce

---

[83] Thomson StreetEvents, Final Transcript of UAL United Continental Holdings Inc. at J.P.
Morgan Aviation, Transportation & Defense Conference at 6 (March 22, 2011).

[84] Thomson StreetEvents, Final Transcript of DAL Delta Air Lines, Inc. at J.P. Morgan Aviation,
Transportation & Defense Conference at 3 (March 22, 2011).

Envelope# 29328052
Case# 1JC-18-1964

its fourth-quarter capacity this year an additional 0.5%. American is taking "a very close look" at its capacity plans for 2012, she added.[85]

97.     At that same conference, Kirby of U.S. Airways stated:

[That] U.S. Airways and the rest of the industry is still profitable [in 2011] . . . is a remarkable testament to how the industry has restructured and there have been these things that have driven it. One, consolidation. ***Second is capacity discipline and I will talk a little bit more about that but hard to under estimate the impact of capacity discipline. . . .***[86]

(Emphases added).

98.     Kerr of U.S. Airways sounded a similar theme at the Citi North American Credit

Conference held in November of 2011:

every announcement I have seen from a capacity perspective is down or minimal growth in 2012, ***which is key for the industry that everybody is keeping the capacity discipline that we need to continue to make the industry profitable . . . . So it's not the same industry that we've had in the past.***[87]

(Emphases added).

99.     Other examples of this collusive recognition in 2011 and the mutual assurances

about the importance of the exercise of capacity discipline by the leading domestic air passenger

carriers abound. For instance, on October 27, 2011, during a call with industry analysts, Jim

Compton ("Compton"), United's Vice-Chairman and Chief Revenue Officer, stated, "***I think our***

***capacity discipline, as well as the industry discipline, what we've seen, I think, we've done a***

---

[85] http://www.wsj.com/articles/SB10001424053111903532804576568922672945908.

[86] Thomson StreetEvents, Final Transcript of U.S. Airways Group Inc. at Deutsche Bank Aviation and Transportation Conference at 1 (Sept. 13, 2011).

[87] Thomson StreetEvents, Final Transcript of U.S. Airways Group Inc. at Citi North American Conference at 4 (Nov. 16, 2011).

Envelope# 29328052
Case# 1JC-18-1964

*good job….*" [88] (Emphases added). As Compton noted in a July 2011 earnings call, "capacity discipline supports higher fares…."[89]

100.    On November 15-16, 2011, Paul Jacobson ("Jacobson"), Senior Vice-President and Treasurer of Delta, Gerry Laderman ("Laderman"), Senior Vice-President of Finance and Treasurer of United, and Kerr of U.S. Airways attended and were speakers at the Citigroup 2011 North American Credit Conference. Laderman's speech directly followed Kerr's speech. Kerr stated to his competitors and other conference attendees, "I think there are 3 main reasons why the industry is doing well. The consolidation that has happened over the last 5 years, capacity discipline and also, the a la carte revenues that have been put in place [*i.e.*, bag and reservation fees] . . . *Going forward, I mean the key is, and the question I get all the time, are people going to keep the capacity discipline that is in place today*? . . . *And every announcement I have seen from a capacity perspective is down or minimal growth in 2012, which is key for the industry that everybody is keeping the capacity discipline that we need to continue to make the industry profitable. . . So it's not the same industry that we've had in the past.*" [90] (Emphases added).

101.    Smisek repeated the theme of an initiative by the major domestic airlines to reduce capacity in a 2011 interview in *Fortune*:

> What we learned is the importance of capacity discipline. Ours has been an industry where it's very easy to add seats, through increased frequencies, flying the aircraft longer, or taking delivery of additional aircraft. In the recession we were very disciplined in getting our capacity down, and *as we saw the recovery with high fuel prices, we've been very disciplined at United and across the*

---

[88] S&P Capital IQ, FQ3 2011 Earnings Call Transcript for United Continental Holdings, Inc. at 13 (Oct. 27, 2011).

[89] S&P Capital IQ, FQ2 2011 Earnings Call Transcript for United Continental Holdings, Inc. at 13 (July 21, 2011).

[90] *See* http://seekingalpha.com/article/308791-us-airways-group-inc-presents-at-citigroup-2011-north-american-credit-conference-novminus-16minus-2011-10-15-am?part=single.

Envelope# 29328052
Case# 1JC-18-1964

> *industry in making sure we've got the right level of capacity and not supplying overcapacity, driving down pricing*.[91]

(Emphases added).

102.    In succeeding years, there was continued joint emphasis on industrywide capacity discipline and continued mutual assurances that capacity discipline would be maintained. In a May 2012 industry conference, for example, Delta's Bastian said *"[w]e've been leaders in capacity discipline for the last couple of years, [and] we will continue to keep that leadership position*."[92] (Emphases added). Similarly, On September 6, 2012, at a Deutsche Bank aviation conference attended by executives from other Defendants, Bastian stated that "*Delta has led the industry in capacity discipline for the last couple of years*. And we'll be prudent again in the fourth quarter."[93] (Emphases added). Likewise, at a J.P. Morgan Aviation, Transportation and Defense Conference held in March of 2012, Kirby of U.S. Airways stated that "*capacity discipline remains intact in the industry*," and "*I'd be surprised if capacity discipline starts to fall apart* and no indication of it….*That's part of the, of course, foundation for what makes the industry successful and what makes our restructured industry work*." (Emphases added).[94] At another conference held in May of 2012, Kirby noted that:

> *[c]onsolidation has also helped with capacity discipline. And it has allowed the industry to do things like ancillary revenues;* again, hard to overstate the importance of that. For U.S. Airways,

---

[91] http://archive.fortune.com/2011/04/19/news/companies/jeff_smisek_united_continental.fortune/index.htm.

[92] Thomson StreetEvents, Edited Transcript of DAL Delta Air Lines at Bank of America Merrill Lynch Global  Transportation Conference at 2 (May 17, 2012).

[93] Thomson StreetEvents, Edited Transcript of DAL Delta Air Lines at Deutsche Bank Aviation & Transportation Conference at 3 (Sept. 6, 2012).

[94] Thomson StreetEvents, Edited Transcript of U.S. Airways at J.P. Morgan Aviation, Transportation & Defense Conference at 3 (March 12, 2012).

48

it will be about $500 million in revenue this year; $500 million in revenue last year. *That is a structural, permanent change to the industry and one that is impossible to overstate the benefit from it*.[95]

(Emphases added).

103.    On January 22, 2013, during an earnings call with industry analysts, an analyst asked "[i]s the airline industry model overall fixed" after noting that "Delta has changed its business model and how peers have had a lot of capacity discipline in the last couple of years"; Delta's Anderson responded that "I will set that question aside" but noted that "2013 will be a really strong year . . . and it will be a good improvement over 2012 . . . which will be the fourth consecutive year [2009-2012] of strong performance."[96] Similarly, on March 4, 2013, at an S&P Capital conference, United's Smisek asserted that **"[t]his is also an industry that has learned the benefits of capacity discipline. Capacity discipline has been very, very good for this business. I think we've all learned from it.**"[97] (Emphases added). Likewise, on May 15, 2013, at a Bank of America conference, John Rainey ("Rainey"), United's former CEO, stated, "**[w]e've got capacity discipline. I think that we recognized that capacity discipline has absolutely being good for this business. For too many years, there's been too much supply chasing the demand. And I would say that we have found religion as an industry in capacity discipline; we recognize the benefit that it brings**."[98] (Emphases added).

---

[95] Thomson StreetEvents, Edited Transcript of U.S. Airways at Bank of America Merrill Lynch Global Transportation Conference at 3 (May 17, 2012).

[96] http://seekingalpha.com/article/1125351-delta-air-lines-ceo-discusses-q4-2012-results-earnings-call-transcript?part=single.

[97] S&P Capital IQ, United Continental Holdings, Inc. Company Conference Presentation at 3 (March 6, 2013).

[98] S&P Capital IQ, United Continental Holdings, Inc. Company Conference Presentation at 3 (May 15, 2013).

Envelope# 29328052
Case# 1JC-18-1964

104.     United's Smisek made a similar point at a global industrials and minerals

conference held in June of 2013, where he stated that "*we are very focused on exercising*

*capacity discipline because this industry, for far too long, through too much capacity at too*

*little demand, and had prices below cost and tried to make it up on volume, and that simply*

*doesn't work. And what we have learned at United and what our industry is learning is that*

*capacity discipline is very important to profitability*."[99] (Emphases added).

105.     U.S. Airways' executives made similar points in a 2013 earnings call. Kirby

stated, "*I think the whole industry has improved. There has been more capacity discipline*

*domestically than there has even been internationally and it is much more rational*."[100]

(Emphases added). Douglas Parker ("Parker"), formerly CEO of U.S. Airways and now CEO of

American, added, "*I think you'll see more capacity discipline and more rationale in the*

*domestic industry, so I'd bet my chips on the domestic improving* faster than international

…."[101]  (Emphases added).

106.     Similar comments emanated from Defendants' executives in 2014. Delta's

Jacobson noted at a September 3, 2014 industry conference that "*we [the industry] have  to*

*maintain capacity discipline even during good times.*"[102] (Emphases added). Similarly,

Southwest's CFO and Executive Vice-President, Tammy Romo ("Romo"), stated in a company

presentation 12 days later that "*the industry as a whole has enjoyed capacity discipline, which I*

---

[99] S&P Capital IQ, United Continental Holdings, Inc. Company Conference Presentation at 4 (June 14, 2013).

[100] Thomson StreetEvents, Edited Transcript of Q4 2012 U.S. Airways Earnings Conference Call at 15 (Jan. 23, 2013).

[101] *Id*. at 15.

[102] Thomson StreetEvents, Edited Transcript of DAL Delta Air Lines Inc. at Cowen Global Transportation Aerospace/Defense Conference at 5 (Sept. 3, 2014).

Envelope# 29328052
Case# 1JC-18-1964

*think is good all the way around, including for Southwest*."[103] (Emphases added). United's

Rainey sounded a similar theme at an industry conference held on September 16, 2014 that was

hosted by Morgan Stanley: "*we certainly understand at United and I think speaking for the*

*industry as well, that capacity discipline has been a fundamental part of this industry's*

*turnaround*."[104]  (Emphases added).

107.     As the Defendants had assured each other, this coordinated capacity discipline led

to higher airfares and fewer seats. As *Forbes* noted in a June 2014 article:

> In the following years [after 2009], even as the demand
> environment improved, network airlines did not add significant
> capacity. Delta Airlines for instance, raised its capacity by only
> 1% during 2009-2013. United lowered its flying capacity from
> 253 billion miles in 2011 to 245 billion miles in 2013. American
> also did not add significant flying capacity to its network during
> this period. As these large airlines maintained steady flying
> capacity even as demand for air travel rose driven by economic
> recovery, overall industry air fares increased. This is also
> highlighted by data from the Bureau of Transportation Statistics
> which shows that average round-trip air fares in current dollars
> increased by 17% during 2007-2013…. *The capacity discipline*
> *was so retained that even today the overall flying capacity in the*
> *domestic U.S. air travel market is below its pre-recession level.*
> *The total available seat miles in the domestic air travel market*
> *were 693 billion miles in 2013, down from 744 billion miles in*
> *2007.*[105]

108.     The Defendants' concerted application of capacity discipline was unabated

through 2014. A January 2015 article from *Air Transport World* described what occurred in 2014

and the airline executives' renewed commitments to continue "capacity reduction" this year:

> *Huge profits. Low fuel prices. Strong demand. In the past, those*

---

[103] S&P Capital IQ, Southwest Airlines Co. Conference Presentation at 2 (Sept. 15, 2014).

[104] S&P Capital IQ, United Continental Holdings, Inc. Company Conference Presentation at 3 (Sept. 16, 2014).

[105] http://www.forbes.com/sites/greatspeculations/2014/06/20/airline-industry-will-have-to-maintain-capacity-discipline-to-remain-profitable/.

Envelope# 29328052
Case# 1JC-18-1964

*factors would likely have led major US airlines to ramp up capacity…but no longer. The US's three global full-service airlines—Delta Air Lines, United Airlines and American Airlines—have all vowed to maintain strict capacity discipline*.

United and American both plan to stay below 3% capacity growth in 2015. Delta has not provided full-year capacity guidance (though president Ed Bastian has said domestic capacity will probably grow "somewhere in the 2% to 3% range"), but has said its March quarter capacity will rise just 3% schedule-over-schedule (factoring in all of last year's winter storm-related cancelations, Delta's first-quarter capacity could rise as much as 5%). That follows low growth in 2014, a year in which all three airlines stayed below 3% year-over-year capacity expansion (United 0.5%, American 2.4% and Delta 3%).

"We are not making any changes to our 2015 capacity plan in light of the lower fuel prices," Delta CEO Richard Anderson told analysts and reporters last week when discussing the carrier's 2014 earnings. "In fact, we continue to trim capacity on the margin to maintain yields and our RASM premium."

Similarly, United chairman, president and CEO Jeff Smisek told analysts and reporters last week, "We're going to run the airline for profit maximization and we're very focused on capacity discipline … We will absolutely not lose our capacity discipline." United plans to grow capacity no more than 2.5% this year.

American plans to increase 2015 capacity 3% year-over-year domestically and 1.5% internationally. CFO Derek Kerr said this week, "You won't see any changes from us in the near future" on the capacity plan.[106]

(Emphases added).

109. The year 2015 represented more of the same. Smisek said in a January 2015 article after United announced a $2 billion profit in 2014, capacity discipline is "*very healthy for us and very healthy for the industry*."[107] (Emphases added). On January 27, 2015, during an earnings call, Kerr of American asserted that "[t]here's been a lot of talk of capacity changes in

---

[106] http://m.atwonline.com/blog/maintaining-capacity-discipline.

[107] http://www.usatoday.com/story/news/2015/01/27/airline-profits-soar-passengers-fuel/22395509/.

52

Envelope# 29328052
Case# 1JC-18-1964

response to lower fuel price. You won't see any changes from us in the near future since we continue to run the airline as though high fuel prices will return."[108] At an industry conference held on May 19, 2015, United's Rainey stated that "*at United we are very focused on capacity discipline, but we're not going to do it at the expense of United and to the benefit of others. The whole industry needs to have that level of discipline*."[109] (Emphases added). Oscar Munoz, United's current President, stated in a September 8, 2015 management call that "*capacity management seems to be something that has worked well in the industry*."[110] (Emphases added).

110. On November 9, 2015, at an industry conference hosted by Robert Baird, Delta's Jacobson stated, "*[w]hen you look at one of the historical criticisms of the industry, it's been around capacity discipline, and growing too fast too quickly in the wrong environment, and facing that capacity growth against a cycle that ultimately reverses itself. If you think big-picture, fuel prices in the fourth quarter are down about 50% year-over-year and Delta's global system capacity is flat .... That is about as disciplined as you can imagine.*"[111] (Emphases added). He added that Delta had a goal "of maintaining capacity."

111. Defendants obtained record profits in 2015, which they attributed in substantial part to "capacity discipline." That discipline also enabled them to implement a significant increase in domestic airfares in January of 2016.

---

[108] http://seekingalpha.com/article/2855206-american-airlines-aal-ceo-doug-parker-on-q4-2014-results-earnings-call-transcript?part=single.

[109] Thomson StreetEvents, Edited Transcript of UAL United Continental Holdings Inc. at Wolfe Research Transport Conference at 12 (May 19, 2015).

[110] Thomson Reuters StreetEvents, Edited transcript of United Continental Holdings, Inc. Management Call at 6 (Sept. 8, 2015).

[111] Thomson StreetEvents, Edited Transcript of DAL Delta Air Lines Inc. Inc. at Robert W. Baird & Co. Industrial Conference at 3 (Nov. 9, 2015).

Envelope# 29328052
Case# 1JC-18-1964

112.    Thus, each of the Defendants has repeatedly assured the others of its commitment to continued "capacity discipline" and has emphasized repeatedly that the "industry" --by which they mean the Defendants--have adopted this joint objective.[112]

---

[112] Representatives of the Defendants have also stressed at earnings calls and other public forums each airline's resolute individual commitment to capacity discipline. In addition to the statements already cited, *see, e.g.*, (1) **Delta**: http://seekingalpha.com/article/749071-delta-air-lines-ceo-discusses-q2-2012-results-earnings-call-transcript (Anderson of Delta confirming in 2012 that "[c]apacity discipline is our key lever. We will continue to actively manage our capacity."); http://news.delta.com/sites/default/files/DAL%203Q15%20Transcript%2010.14.pdf (Anderson saying in 2013 that that "[c]apacity discipline has built a strong permanent revenue producing foundation for Delta with the eighth consecutive quarter of a year-on-year revenue premium."); http://seekingalpha.com/article/1760882-delta-air-lines-management-discusses-q3-2013-results-earnings-call-transcript?part=single (Bastian of Delta saying in 2013 that "[r]est assured that our commitment to maintaining strong capacity discipline remains in place."); http://seekingalpha.com/article/2334145-delta-air-lines-dal-ceo-richard-anderson-on-q2-2014-results-earnings-call-transcript?part=single (Anderson saying in 2014 that "[a]s we look forward to the remainder of 2014 and beyond, Delta will continue to maintain the steady course we have been on, especially our disciplined approach to capacity levels. This discipline continues to be a key driver of our success, as we will post record results for 2014."); http://www.thestreet.com/story/13114108/2/delta-air-lines-dal-earnings-report-q1-2015-conference-call-transcript.html (Anderson announcing in 2015 that "[w]e will continue to be disciplined with our domestic capacity levels, with our domestic growth driven by higher gauge and fewer total airplanes, which will cause us to improve efficiency and drive higher operating margins"); (2) **United:** S&P Capital IQ, United Continental Holdings, Inc. Company Conference Presentation at 2 (Sept. 13, 2011) (United's Smisek saying in 2011 that "[w]e have shown great capacity discipline and we intend to do so. That's very important and I think not only we but I think our industry is recognized with high-input prices, that we've made mistakes in the past in not being disciplined with our capacity, not being able to have compensatory fares, and we certainly at the new United, are going to be very focused on capacity discipline."); http://www.nytimes.com/2012/07/31/business/airlines-adjust-their-fleets-and-passengers-often-suffer-on-the-road.html?_r=0 (Compton of United saying in 2012 that "[w]e remain committed to capacity discipline to generate sustained and sufficient profitability."); http://seekingalpha.com/article/1372281-united-continental-holdings-management-discusses-q1-2013-results-earnings-call-transcript?part=single (Compton saying in 2013 that "[c]apacity discipline remains a key tenet of our strategy."); http://articles.chicagotribune.com/2014-01-23/business/chi-united-continental-swings-to-4q-profit-as-fares-rise-20140123_1_united-ceo-jeff-smisek-united-airlines-united-continental-holdings (Compton saying in 2014 that "[c]ontinued capacity discipline has supported the consistent unit revenue growth in the last several quarters and we expect domestic strength to continue into the fourth quarter."); http://articles.chicagotribune.com/2014-01-23/business/chi-united-continental-swings-to-4q-profit-as-fares-rise-20140123_1_united-ceo-jeff-smisek-united-airlines-united-continental-holdings (Compton saying in 2014 that "[l]et me assure you that we will continue to be disciplined in how and where we deploy capacity."); (3) **Southwest:** S&P Capital IQ FQ4 2009 Earnings Call Transcript for Southwest Airlines at 4 (Jan. 21, 2010) (Wright of Southwest saying that it had a "an almost 8% reduction in our capacity.") http://seekingalpha.com/article/2162863-southwest-airlines-management-discusses-q1-2014-results-earnings-call-transcript?part=single (Romo of Southwest saying in 2014 that "[w]e continue to have a disciplined growth strategy with flat year-over-year ASM [available seat mile] capacity in 2014."); S&P Capital IQ FQ4

54

113.    These developments made the leadership of IATA--the trade association to which United, American and Delta belong--very pleased. In February of 2011, an IATA press release noted with respect to North American air transportation carriers, that "[a] key feature in 2010 was the capacity discipline…."[113] Similarly, in a June of 2013 speech delivered in Cape Town, Tony Tyler, the Executive Director of IATA who succeeded Bisignani, noted that airline profits were coming from better use of capacity, citing an industry load factor of "80.3%, which is an increase of ten percentage points over the last decade."[114] And an IATA analysis, published in June 2015 (in conjunction with the General Meeting referenced below), on the "Economic Performance of the Airline Industry" noted approvingly that the profitability of the United States airlines had increased the most, and concluded that "US airlines consolidated after the global financial crisis and . . . have been very disciplined about adding capacity."[115]

---

2011 Earnings Call Transcript for Southwest Airlines at 4 (Jan. 19, 2012) (Wright saying that "our 2012 combined available seat capacity will be relatively flat with our 2011 combined capacity); (4) **American:** S& P Capital IQ FQ1 2009 Earnings Call Transcript for American Airlines Group Inc. at 3-4 (Jan. 20, 2010) (Arpey of American saying in 2010 that "[w]e're going to remain disciplined when it comes to capacity because it's clear than ever that this industry will not be healthy, and certainly won't generate sufficient returns for shareholders . . . [without capacity discipline]."); S&P Capital IQ FQ2 Earnings Call Transcript for American Airlines Group Inc. at 4 (July 21, 2010) (Arpey stating in 2010  that "industry capacity should not grow faster than gross domestic product here in the U.S."); S&P Capital FQ1 2011 American Airlines Group Inc. Earning Transcript at 2 (April 20, 2011) (Arpey assured American's competitors that American is "taking a disciplined approach to our capacity."); S&P Capital FQ1 2011 American Airlines Group Inc. Earning Transcript at 13 (Jan. 9, 2011) (Isabella Goren, American's former CFO, Principal Accounting Officer and Senior Vice-President, saying in 2011 that the company has demonstrated "capacity discipline."); http://aviationblog.dallasnews.com/2015/02/we-meant-to-tell-you-other-tidbits-from-the-american-airlines-earnings-call.html/ (American's Kerr saying in 2015 that "[t]here has been a lot of talk of capacity changes in response to lower fuel prices. You won't see any changes from us in the near future since we continue to run the Airline as though high fuel prices will return.").

[113] http://www.iata.org/pressroom/pr/Pages/2011-02-02-01.aspx.

[114] http://www.iata.org/pressroom/speeches/Pages/2013-06-03-02.aspx.

[115] http://www.iata.org/whatwedo/Documents/economics/Economic-Performance-of-the-Airline-Industry-mid-year-2015-forecast-slides.pdf. By comparison, as noted by IATA, other markets are fragmented; the top four airlines in Europe have only a collective 36% market share.

55

114.    The Defendants' activities with respect to "capacity discipline" were not limited to assurances to each other of their "capacity discipline" intentions at earnings call sessions. As noted above, the Defendants' executives participated together in various conferences where their common commitment to "capacity discipline" was discussed. The Defendants have also coordinated their positions on this issue through Airlines for America, the trade group on the Board of which three of the Defendants have members. And their chief executives participate in the "Conquistadores del Cielo" (Captains of the Sky), a "secret club" of top aviation executives that meets "off the record" twice a year.[116] The group first met in Arizona in 1937 at the invitation of executives from the now-defunct Trans-World Airlines. It organized itself as a non-profit entity the following year and includes as its members 91 executives from, *inter alia*, major airlines such as the Defendants. The American-U.S Airways merger was apparently pitched initially at a meeting of this group.[117]  These venues provide abundant opportunities for the Defendants' executives to meet face to face and conspire on capacity reduction and pricing.

115.    Defendants' executives were or should have been well aware that what they were doing could give rise to antitrust violations. American's "Standards of Business Conduct" statement  asserts that:

> Antitrust laws prohibit certain agreements or understandings between competitors about competitive matters. ***"Competitive matters" include*** prices and fares, ***output,*** terms or conditions of sale, customers or geographic areas served, schedules, yield management, inventory control, seating configurations, and marketing programs. ***If competitors take similar actions after communicating with each other, the government or private plaintiffs may try to claim that there was an agreement, even if no such agreement exists. To minimize the risk of such claims***

---

[116] http://viewfromthewing.boardingarea.com/2015/11/07/conquistadors-del-cielo-the-secret-club-for-airline-executives/.

[117] *Id.*

Envelope# 29328052
Case# 1JC-18-1964

*being brought, it is important that we always be clear that our actions are not being taken pursuant to an agreement with a competitor.* Antitrust violations can be serious criminal matters, resulting in severe fines and jail terms.[118]

(Emphases added). United's "Ethics Code and Compliance Principles" likewise states that

"United representatives may *never discuss or share commercially sensitive information such as*

*pricing, capacity*, or cost data of any kind with competitors without prior approval from the

Legal Department."[119] (Emphases added). Delta's antitrust compliance policy asserts that:

There are many legitimate reasons why Delta employees may have contact with other airlines, such as trade association conferences or meetings to discuss interline agreements or common airport facilities. *However, even the appearance of an agreement with competitors can sometimes result in antitrust litigation.*

*For this reason, you should avoid discussions with any competitor of prices, terms of sale, allocation of markets or customers, competitive bidding processes and similar matters.* Before attending any meeting or event at which competitors may be present, be sure you know the antitrust rules that govern your conduct.[120]

(Emphases added). In the same document, Delta states that it "is committed to competing fairly

and avoiding even the *appearance* of improper agreements and understandings with

Competitors….*Receiving or accepting information from competitors can create the*

*appearance of impropriety. Therefore, you should not accept or exchange such information*

*unless you are certain that your conduct is permissible*."[121] (Emphases partly in original and

partly added).

---

[118] https://www.aa.com/content/images/amrcorp/StandardsofBusinessConduct.pdf.

[119] Available at http://ir.united.com/phoenix.zhtml?c=83680&p=irol-govconduct.

[120] http://s1.q4cdn.com/231238688/files/doc_downloads/governance/CodeofEthics_021004.pdf at 13.

[121] *Id*. at 14.

Envelope# 29328052
Case# 1JC-18-1964

### E. SOUTHWEST'S RECENT PROPOSAL TO ADD CAPACITY, THE RESPONSES AT THE 2015 IATA GENERAL MEETING, AND SOUTHWEST'S REVERSAL OF POSITION

116.    On May 19, 2015, the Wolfe Research Transport Conference was held. Romo of Southwest, Kirby, now President of American, and Rainey of United were among those present. Romo discussed Southwest's 2015 capacity plans, which had been finalized the prior week. Romo described them as follows: "with the additional two gates that we have acquired at Dallas Love Field, and our plans to expand service at Houston Hobby, our full year 2015 available seat miles falls in the 7% to 8% range, year-over-year. And so, again, the majority of that capacity is related to our rapid and very successful expansion out of Dallas Love Field."[122] Rainey immediately responded that "[w]e are a big believer in the right balance between supply and demand, and we've demonstrated our capacity discipline….And so we'll continue to believe in that."[123] Rainey subsequently issued the veiled threat that "*at United we are very focused on capacity discipline, but we're not going to do it at the expense of United and to the benefit of others. The whole industry needs to have that level of discipline*."[124] (Emphases added). Hunter Keay ("Keay"), an analyst at Wolfe Research, picked up on all of this and suggested to Romo that "what's best for your shareholders might not be what's best for you but what's best for the industry…."[125] Romo was thrown on the defensive and responded by saying "[w]ell Hunter, we're very focused on capacity, doing what's right of course, for the Southwest shareholders. What we want to do is, enable lot of flexibility in our fleet plans. I think the story for 2015 is

---

[122] Thomson Reuters StreetNews, Edited Transcript of LUV Southwest airlines Co. at Wolfe Research Transport Conference at 5 (May 19, 2015).

[123] *Id*. at 7.

[124] *Id*. at 16.

[125] *Id*. at 7.

Envelope# 29328052
Case# 1JC-18-1964

really straightforward, and it is largely a Love Field story."[126] Kelly of Southwest was reported as confirming this modest expansion of capacity on the following day.[127]

117.    The reaction of industry analysts was instantaneous, expressing concern that Southwest's contemplated move would lead to industry-wide capacity increases and that likely price reductions that would result.  "Understandably, investors are questioning if this signals the end of the era of industry capacity discipline,"[128] Raymond James analyst Savanthi Syth wrote in a research note. Similarly, Keay expressed concern that "[d]omestic capacity discipline has effectively vanished."[129]

118.    The other Defendants recognized that they had to ensure that Southwest did not break ranks on the capacity issue.

119.    In a presentation on June 4, 2015 at the Deutsche Bank Global Industrials & Basic Materials Conference, Rainey of United noted that his company was enjoying a huge cash flow in 2015. He then went on to say "*[a]nd something has to be done with that free cash flow, right? And what I would hope investors take comfort in is you're not seeing airlines go out and say, 'Oh, my gosh. Now I've got all these free cash flow. Let me place a big aircraft order,' because that was the mistake of years ago*."[130] (Emphases added). Just as he had done at the Wolfe Conference, Rainey was sending a clear message to Southwest to scale back its capacity

---

[126] *Id*.

[127] http://www.reuters.com/article/2015/05/20/us-airlines-competition-dallas-idUSKBN0O52U220150520.

[128] http://www.stltoday.com/business/local/airline-shares-down-after-news-of-southwest-capacity-expansion/article_858fa03e-a121-5082-af86-50e05e116781.html.

[129] http://www.wsj.com/articles/southwests-upgraded-growth-plans-stir-airline-stocks-1432157456.

[130] S&P Capital IQ, United Continental Holdings, Inc. Company Conference Presentation at (June 4, 2015).

expansion plans.

120. The pressure on Southwest only intensified at the IATA Annual General Meeting held in Miami, Florida, on June 7-9, 2015. Chief executives of each of the Defendants were in attendance. During the course of that meeting, several of them emphasized the continued need for capacity discipline.[131] Bastian committed that Delta is "*continuing with the discipline that the marketplace is expecting.*" (Emphases added). American's Parker reminded the others that they should have learned their lessons from past price wars; "*I think everybody in the industry understands that.*" (Emphases added). Although not a Defendant here, Air Canada's CEO, Calin Rovinescu, echoed these views, saying "*[p]eople were undisciplined in the past, but they will be more disciplined this time*." (Emphases added).

121. The references to the "marketplace," the "industry" and "people" were clearly designed to send a message to Kelly and Southwest. As one commentator, James B. Stewart, observed in a June 11, 2015 *New York Times* article, "'Discipline' is classic oligopoly-speak for limiting flights and seats, higher prices and fatter profit margins. This year, that discipline seems to be working: the I.A.T.A. projected this week that airline industry profits would more than double this year to nearly $30 billion, a record."[132] The same article noted:

> "When airline industry leaders say they're going to be disciplined,' they mean they don't want anyone to expand capacity," said Fiona Scott Morton [("Morton")], professor of economics at Yale and a former deputy attorney general in the antitrust division of the Justice Department. "And when there aren't enough seats, airlines raise prices. That's what we've been seeing."[133]

---

[131] http://www.nytimes.com/2015/06/12/business/airline-discipline-could-be-costly-for-passengers.html.

[132] *Id.*

[133] *Id.*

Envelope# 29328052
Case# 1JC-18-1964

122.     These pronouncements by airline executives and the pressure placed on Southwest by Rainey at two industry conferences and by Bastian, Parker and others at the IATA Annual General Meeting had the desired effect. The *New York Times* article cited above reported that "after coming under fire at this week's conference, Southwest quickly moved to reassure investors it isn't going rogue. '***We have taken steps this week to begin pulling down our second half 2015 to manage our 2015 capacity growth…***' Kelly said." (Emphases added). It is clear that Southwest knuckled under to the collusive capacity discipline requirements imposed by its competitors.[134]

### F.  REACTIONS OF SENATORS, REGULATORS AND OTHERS

123.     United States Senator Richard Blumenthal ("Blumenthal") was incensed at these developments regarding Southwest's reconsideration of its stated plan to increase capacity. On June 17, 2015, he wrote a letter to Baer of DOJ.[135]  With respect to the withdrawal by Southwest of its plans to increase capacity, Blumenthal stated that ***"[t]he conclusion seems inescapable that the remarks made at IATA were targeted at Southwest and that its capitulation was the result of the 'fire' aimed at the company*.**" (Emphases added).

124.     The letter further states:

> Recently, the International Air Transport Association (IATA) brought together the top executives of the world's largest airlines at its annual meeting in Miami, Florida. The *New York Times* reported that at this meeting many of these competitors publicly discussed their strategies to remain "disciplined" in their decisions to manage capacity across their flight routes. As you know from the Department of Justice's (DOJ's) investigation into U.S. Airways' merger with American Airlines in 2013, most airlines have traditionally viewed capacity reductions as a highly valuable

---

[134] *Id.*

[135] http://www.blumenthal.senate.gov/imo/media/doc/20150617%20Blumenthal%20to%20DOJ%20Airline%20Coordition.pdf.

61

way to artificially raise fares and boost profit margins. ***In light of the recent unprecedented level of consolidation in the airline industry, this public display of strategic coordination is highly troubling***.

Therefore, I urge the Justice Department to investigate this apparent anti-competitive conduct potentially reflecting a misuse of market power, and excessive consolidation in the airline industry. DOJ itself played a part in this consolidation by approving several mergers and now consumers are paying sky-high fares as airlines engage in market conduct designed to keep capacity artificially low.

(Emphases added).

125.    Blumenthal's letter concluded:

In August 2013, the Justice Department filed an antitrust lawsuit to block the proposed merger between U.S. Airways and American Airlines. A few months later, DOJ settled that case and allowed the merger to proceed subject to a number of gate divestitures. As a result of that merger, just four major airlines now account for eighty percent of all domestic air travel.

DOJ's original complaint painted a stark picture of an extremely consolidated market, in which a few firms wield enormous market power to the detriment of consumers and competition – and in which high-level executive believe there is an unmistakable link between fluctuations in capacity and fares hikes. During the course of the Antitrust Division's review of the American Airlines / U.S. Airways merger, your staff studied the internal analyses and the planning documents put together by both companies in considering the likely effects of the merger. During DOJ's original announcement rejecting the merger you stated, "High level executives at U.S. Airways have talked about how consolidation allows for capacity reductions that "enable" fare increases."

In particular, DOJ's complaint provided evidence of past behavior by U.S. Airways to punish a rival for its reducing fares; it also alleged that the merger would reduce capacity and growth across the industry; and result in increased coordinated interaction among the remaining legacy airlines.

The Complaint specifically documented the troubling history of U.S. Airways communicating directly to a rival airline that it was upset by that airline's efforts to compete more aggressively. In 2010, senior executives at U.S. Airways complained that

62

competition from the rival airline was "hurting profitability" in the industry. DOJ wrote: "[S]enior management debated over email about how best to get the rival airline's attention and bring it back in line with the rest of industry. . . .

The Justice Department also correctly predicted that this kind of behavior would continue should the merger be allowed to proceed – as it ultimately was. In the original complaint, DOJ wrote, "The structure of the airline industry is already conducive to coordinated behavior…the legacy airlines closely watch the pricing moves of their competitors. When one airline 'leads' a price increase, other airlines frequently respond by following with price increases of their own."

**To bring home the point, the Complaint follows, "Coordination becomes easier as the number of major airlines dwindles and their business models converge."**

**I agree. I therefore urge the Antitrust Division to conduct a full and thorough investigation of anticompetitive, anti-consumer conduct and misuse of market power in the airline industry, evidenced by recent pricing patterns as well as remarks made at the IATA conference. Consumers are paying sky-high fares and are trapped in an uncompetitive market with a history of collusive behavior. If you find that these comments were coordinated to punish Southwest Airlines' announcement of capacity increases, I urge you to use all the tools at your disposal to punish this anti-competitive and anti-consumer behavior.**

(Emphases added).

126.    The DOJ acted promptly. On July 1, 2015, it was reported that the DOJ had sent CIDs to a number of airlines on June 30, 2015. A spokesperson for the DOJ, Emily Pierce, confirmed this report, saying that the DOJ was investigating "possible unlawful coordination" to limit capacity increases, and thereby keeping ticket prices high.[136] Defendants all received these and the inquiry extends to their relationships with common investors.[137]

---

[136] http://www.cnn.com/2015/07/01/politics/doj-subpoenas-airlines-unlawful-coordination/.

[137] http://www.crainsnewyork.com/article/20150922/TRANSPORTATION/150929964/antitrust-officials-probe-airlines-with-shared-investors. For Securities & Exchange Commission filings on this topic, *see* http://ir.united.com/phoenix.zhtml?c=83680&p=irol-

127.     This was not a minor matter. The DOJ's *Antitrust Division Manual* states that CIDs may be served on suspected violators if "there is 'reason to believe' that any violation within the Division's scope of authority has occurred." *See* United States Department of Justice, *Antitrust Division Manual*, at III-45 (5th ed. April 2015).[138] As Gene Kimmelman, a former official in the DOJ's Antitrust Division, has noted, "[t]he Justice Department doesn't just launch investigations as fishing expeditions…. There's a keen awareness that when they request documents, there's a significant cost to companies, it's not easy and there are a lot of expenditures. . . . They have to have a strong reason to believe there may be a violation of law."[139]

128.     The CIDs have not officially been made public, but the *Dallas Morning News* obtained a copy of one of them and summarized the requests contained in it as follows:

> – Tell us who in your company sets the communications strategy to shareholders, investors or analysts and who does that communication.
>
> – Give us any documents "discussion [*sic*] (a) the need for, or the desirability of, capacity reductions or growth limitations by the company or any other airline; or (b) the undesirability of your company or any other airline increasing capacity."
>
> – Give us any of your documents that talk about changes in your capacity or that of your competitors.
>
> – Give us any communications between you and outside parties

---

SECText&TEXT=aHR0cDovL2FwaS50ZW5rd2l6YXJkLmNvbS9maWxpbmcueG1sP2lwYWdlPTEwMzkzMzM4JkRTRTV9MCZTRTV9MCZTUURFU0M5U0VElPTl9FTlRJRUJUUmc3V
ic2lkPTU3;
https://www.sec.gov/Archives/edgar/data/4515/000119312515261937/d945812d10q.htm;
https://www.sec.gov/Archives/edgar/data/92380/000009238015000098/luv-6302015x10q.htm.

[138] http://www.justice.gov/sites/default/files/atr/legacy/2015/05/13/atrdivman.pdf.

[139] http://www.washingtonpost.com/business/economy/doj-investigating-potential-airline-collusion/2015/07/01/42d99102-201c-11e5-aeb9-a411a84c9d55_story.html.

about your capacity or that of your competitors and how capacity changes affect fares, revenues or profits.

– Tell us the time and place of any conference, meeting or appointment, including telephone calls, you have involving industry analysts (we want your appointment books, day planners, calendars, etc., as well as any materials preparing for such contacts)

– Tell us the time and place of any conference, meeting or appointment, including telephone calls, you have had involving other airlines in which capacity was discussed (we want your appointment books, day planners, calendars, etc., as well as any materials preparing for such contacts)

– We want to know everybody who owns at least 2 percent of your company, including the time that person owned that much of your company.

– Concerning those people who owned at least 2 percent, tell us about all your meetings, appointments or conference with those people in which industry capacity was discussed. We want to see any calendars, appointment books, day planners, etc., that were involved, as well as any documents prepared for those discussions and which talked about those discussions afterward.

– We want to know how much capacity you flew, in available seat miles, every month since January 2010, and please include the seat miles flown by your regional partners as well.

– Spell out your document retention policy including emails.

– Tell us who is preparing this information and submitting it to us. If someone gives that preparer some oral instructions, tell us who gave the oral instructions and what he and she said.[140]

129.    The DOJ is not the only antitrust regulator that has been investigating the

anticompetitive conduct at issue here.  On July 1, 2015, George Jepsen, the Attorney General of

the State of Connecticut, announced that his office is conducting a similar investigation into

collusive activity among air carriers and had sent letters to Delta, United, American and

---

[140] http://aviationblog.dallasnews.com/2015/07/ap-justice-is-looking-into-airline-collusion-on-holding-down-capacity.html/.

Southwest.[141]

130.    Blumenthal welcomed the DOJ's action, saying "[t]his investigation must be tireless and timely to save consumers from the onslaught of price increases in summer fares that may result from collusive and anticompetitive airline company misconduct."[142] Schumer agreed, stating that **"[i]t's hard to understand, with jet fuel prices dropping by 40 percent since last year, why ticket prices haven't followed….We know when airlines merge, there's less price competition**."[143] (Emphases added).

131.    The Business Travelers Coalition ("BTC"), which provides a platform for the managed travel community and is supported by numerous major corporations, also applauded the initiation of this investigation:

> **"The number one concern that antitrust experts have - with no close second - as with regard to radical consolidation of any industry, is the risk of tacit competitor coordination on policies, practices and prices among a reduced number of industry participants," stated BTC chairman Kevin Mitchell. "Since recent U.S. airline mega-mergers, we have witnessed near constant airline CEO calls for 'capacity discipline' during industry gatherings and analyst earnings calls only to be echoed by analysts in follow-on earning calls with other airlines. This represents perhaps the darkest hours of airline coordination as well as a too-cozy harmonization between airlines and Wall Street," added Mitchell**.[144]

(Emphases added).

---

[141] http://www.reuters.com/article/2015/07/01/us-airlines-connecticut-probe-idUSKCN0PB61520150701.

[142] http://www.blumenthal.senate.gov/newsroom/press/release/blumenthal-statement-on-doj-investigation-into-potential-airline-collusion,

[143] http://www.npr.org/sections/thetwo-way/2015/07/01/419245511/justice-department-investigating-airlines-for-possible-price-collusion.

[144] http://www.businesstravelcoalition.com/press-room/2015/july-1---btc-applauds-us.html.

66

132.    Despite the actions of the DOJ, the Defendants refused to give up on capacity discipline. For example, on July 10, 2015, American announced that it was reducing its capacity plans for 2015 even further.[145] Similarly, as noted above, Delta executives continued to preach the gospel of capacity discipline at a November 2015 industry conference and in announcing airfare price increases in January of 2016 that were promptly implemented by the other Defendants.

133.    Since the DOJ's investigation began, airfares on certain routes have declined, suggesting that Defendants are reacting explicitly to the governmental probe. Commentators have noticed the connection. As stated in one article, "[t]he ramped-up competition comes after stubbornly high fares drew the attention of federal investigators. The Justice Department started investigating the nation's four largest airlines this summer for potentially colluding to limit their growth -- and keep prices high."[146] The present conduct by Defendants indicates they had the ability to lower airfares, but collectively chose not to do so until the government's investigation forced their hand.

134.    These declines were confined to certain routes where Defendants faced competition from discount carriers. As noted above, on an overall basis, the Defendants earned record profits in 2015 and have succeeded in pushing through a major domestic airfare price increase in January of 2016.

## G.  DEFENDANTS ENGAGE IN OTHER PRACTICES THAT  FACILITATE COLLUSION ON CAPACITY REDUCTION

135.    The Defendants have engaged in other practices that facilitate their alleged conspiracy on capacity reduction and airfares.

---

[145] http://aviationblog.dallasnews.com/2015/07/american-airlines-cuts-2015-capacity-plans-a-bit.html.

[146] http://www.dailyherald.com/article/20151109/business/151109740/.

67

Envelope# 29328052
Case# 1JC-18-1964

136. The BTC article cited above noted that the "tacit coordination on capacity" was accompanied by an "even more aggressive and widely coordinated attack on price transparency, consumer protections and competition." The BTC offered the following evidence of this coordinated attack by Defendants:

ANCILLARY FEE DATA

Since 2008, the Big Three U.S. airlines (Delta Air Lines, American Airlines, United Airlines) have rejected their most valued corporate customers' demands for ancillary fee data that would enable their business travelers to efficiently see, compare and buy ancillary services (*e.g.*, checked bags, preferred seats) in the same transaction as the base airfare. Leisure travelers must navigate airline websites in search of best airfare and ancillary fee combinations often paying higher prices than necessary. In total, this opacity results in these ancillary fees not being disciplined by market forces. Likewise, there is great profit in consumer confusion.

. . . .

NORWEGIAN AIR INTERNATIONAL'S (NAI) APPLICATION

Under the EU-US Open Skies agreement, NAI's application to serve the U.S. should have been a 5-week pro forma review and approval. Instead, airlines' political pressure has held up approval for 15 months. This is as embarrassing to the United States as it is outrageous in its harm to U.S. consumers. Airlines fear that if NAI's low-fare business model were to be embraced by U.S. consumers, other carriers like Ryanair and JetBlue would seek to emulate NAI's success.

. . . .

PROTECTION FROM GULF CARRIER COMPETITION

The Big Three claim that the Gulf airlines -- Emirates, Qatar and Etihad -- receive government support that is harming the U.S. carriers. The Big Three co-opted Congress again with a Congressional letter that supports the Big Three's call for a freeze in new air services by the Gulf airlines -- all without having allowed those carriers an opportunity to respond to the allegations, not to mention the glaring hypocrisy that the U.S. airline industry, by the Big Three's very own math, has been the most heavily

68

taxpayer subsidized and structurally advantaged in the history of commercial aviation. Brazenly, the airlines recently warned the Obama Administration that if they don't play ball, the Big Three will again seek Congressional legislative support.[147]

137.    The BTC is not alone in its concerns about Defendants' efforts to curb fare transparency to customers as a facilitating device to keep domestic air passenger fares high. On May 19, 2015, the Travel Technology Association, the premier trade association for the travel technology industry, issued a report, prepared by Charles River Associates and authored by the aforementioned Morton, entitled, "Benefits of Preserving Consumers' Ability to Compare Airline Fares."[148] The report noted that competition had suffered because of domestic passenger airline mergers and efforts by the major airlines to lead travelers away from online travel agencies ("OTAs") that facilitate price comparisons of fares and other anticompetitive aspects of the recent consolidation in the domestic air passenger services industry.  Its major findings were:

- --Restrictions by airlines of broad access to airline information—prices and schedules—substantially reduce consumer welfare. This study estimates the potential reduction in net consumer welfare of limiting airline price and schedule information to only airline websites could exceed $6 billion per year. Additionally, such restrictions may result in up to 41 million passengers annually choosing not to fly.

- --In addition to offering independent price comparisons, OTAs and metasearch travel sites provide consumers with other travel information, such as suggestions for places to go and things to do. Supplementing airline schedule information with complementary information and products expands the market for air travel, further increasing consumer welfare.

- --Airline markets are highly concentrated, with significant barriers to

---

[147] Through the efforts of Delta, American and United and the Airline Pilots Association, 262 members of the United States House of Representatives and 22 senators have asked the President in the letter referred to by BTC to freeze the number of flights into the United states by Persian Gulf airlines; the three carriers also met separately with the Secretaries of State, Transportation and Commerce to press this demand. http://www.washingtontimes.com/news/2015/oct/14/big-3-airlines-flexing-their-political-muscle-in-w/?page=all.

[148] http://www.traveltech.org/wp-content/uploads/2015/05/CRA.TravelTech.Study_.pdf.

Envelope# 29328052
Case# 1JC-18-1964

entry. The recent merger of American Airlines and U.S. Airways has led to fare increases in affected city-pair markets that are about 4 percent higher than in non-affected markets. In certain city-pair markets in which the merger reduced the number of significant competitors from 3 to 2, or from 2 to 1, fare increases have been 7 to 17 percent. The welfare-enhancing impacts of broad access to airline fare and schedule information may be even larger in duopoly or monopoly city pairs.

- --Airline profits globally are at an all-time high, expected to reach $25 billion for 2015. While airline fuel prices declined nearly 25 percent last year, average domestic airfares have remained flat while ancillary revenue of the major U.S. airlines grew to over $15 billion in 2014.

138.    The report went on to note that the airlines have engaged in coordinated efforts to stifle online metasearch airfare websites. These efforts included the following conduct:

- Prohibiting metasearch sites from referring consumers to an OTA for booking a flight.

- Prohibiting OTAs from providing airline information to metasearch sites.

- Prohibiting GDSs from providing airline price and schedule information to "unauthorized" metasearch sites.

- Prohibiting onward-distributing flight schedule information to metasearch sites by services such as Innovata.

- Refusing to pay metasearch sites for direct referrals to the airline's own booking website.

- Prohibiting metasearch sites from displaying price information of the airline.

The report offered specific examples of such conduct undertaken by Delta, American, and United. The report estimated that in the absence of transparent information about airfares, the airlines earn approximately an extra $30 on leisure and business passengers.

139.    In response to the airlines' assertions that they price airfares on demand, Morton said in the aforementioned *New York Times* article that "'on most airline routes, consumers have very little choice.' She noted that only airlines can now set prices significantly above marginal

70

cost. 'That's great for the industry but not for consumers,' she said."[149]

140.    Schumer has expressed his concerns on this point:

> With high ticket prices, additional fees and limited carriers, we must ensure airlines aren't taking further steps to prevent consumers from comparison shopping. That's why, in light of the recent Justice Department probe into possible airline collusion, I am urging the feds to step up their efforts and do a full investigation into this new deceiving practice that limits access to cheaper, more affordable airfares for consumers. So many consumers rely on bargain hunting when purchasing flights and this practice makes it almost impossible by restricting transparency and limiting competition among airlines....Freezing out websites that save travelers money on airfare is just plain wrong and the feds should include this practice in their investigation immediately.[150]

141.    On March 17, 2016, Blumenthal and Senator Edward Markey sent a letter to United States Transportation Secretary Anthony Foxx to investigate a rising number of complaints about airlines refusing to provide their fares to third-party booking or price-comparison websites. They said that the airlines' opaque attempt to limit how its fares are publicized beyond their own corporate websites denies consumers a chance to comparison shop and make good purchasing decisions:

> We believe this practice is damaging to consumers and potentially in violation of our consumer protection laws that promote competition in the air transportation industry. Accordingly, we urge the Department of Transportation...to use its existing statutory authority to promote transparent price competition that will allow consumers to quickly and easily make good purchasing decisions.

---

[149] http://www.nytimes.com/2015/06/12/business/airline-discipline-could-be-costly-for-passengers.html.

[150] http://www.schumer.senate.gov/newsroom/press-releases/schumer-reveals-in-move-that-could-cost-travelers-6-billion-more-a-year-airlines-are-working-to-prevent-consumers-from-shopping-around-for-best-flight-price-by-refusing-to-share-flight-info-with-websites-like-expedia-orbitz-tripadvisor-and-others-senator-pushes-feds-to-investigate-new-airline-policyon-top-of-current-collusion-investigation.

Envelope# 29328052
Case# 1JC-18-1964

Price comparison websites allow consumers to make apples-to-apples comparisons among fares and flights, acting as a catalyst for pricing competition. Decisions by the airlines to withhold their flight data seem intended to push travelers towards the airlines' own websites, where they can add-on extra fees to ticket prices for seat selection, early boarding or bag-check and luggage handling….However, when airlines restrict third parties from accessing their flight scheduling and fare data, they make it harder for consumers to pick the best price, schedule and airport from all available options. Making comparison shopping more difficult for consumers could also aid airlines in tacitly coordinating their ancillary fees, helping to shroud and hide the true cost of flying from the market.[151]

## IX. CLASS ACTION ALLEGATIONS

142.    As explained above, the conspiracy asserted here is alleged to have commenced in 2009, but Plaintiffs only seek classwide recovery for the period extending four years back from the date on which the initial class complaint in these consolidated cases was filed (*DeVivo v. Delta Airlines, Inc*., No. 7:15-cv-05162 (E.D.N.Y., filed on July 1, 2015)). Plaintiffs therefore bring this action on their own behalf and as a class action pursuant to Rule 23(a) and (b) of the Federal Rules of Civil Procedure on behalf of the following Class (the "Class"):

> All persons and entities that purchased air passenger transportation services for flights within the United States and its territories and the District of Columbia from Defendants or any predecessor, subsidiary or affiliate thereof, at any time between July 1, 2011 and the present. Excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, Defendants' officers, directors, employees, and immediate families, and any judges or justices assigned to hear any aspect of this action.

143.    Plaintiffs do not know the exact number of members of the Class because such information is in the exclusive control of Defendant. Due to the nature of the trade and commerce involved, however, Plaintiffs believe that Class members number at least in the

---

[151] http://www.blumenthal.senate.gov/imo/media/doc/[Untitled].pdf.

millions and are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all Class members is impracticable.

144.    There are questions of law and fact which are common to the claims of Plaintiffs and the Class, including, but not limited to:

a.    Whether Defendants engaged in a combination or conspiracy with their co-conspirators to fix, raise, maintain, and/or stabilize the prices for fares charged for air passenger transportation services by, *inter alia,* collusively reducing capacity;

b.    Whether the purpose and/or effect of the acts and omissions alleged herein was to restrain trade, or to affect, fix, control, and/or maintain the prices for air passenger transportation services by, *inter alia,* collusively reducing capacity;

c.    The existence and duration of the horizontal agreements alleged herein to fix, raise, maintain, and/or stabilize the prices for air passenger transportations services;

d.    Whether Defendants violated Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

e.    Whether Defendants' agents, officers, employees, or representatives participated in correspondence and meetings in furtherance of the illegal conspiracy alleged herein, and, if so, whether such agents, officers, employees, or representatives were acting within the scope of their authority and in furtherance of Defendants' business interests;

f.    Whether, and to what extent, the conduct of Defendants caused injury to Plaintiffs and members of the Class, and, if so, the appropriate measure of damages; and

g.    Whether Plaintiffs and members of the Class are entitled to injunctive relief to prevent the continuation or furtherance of the violation of Sections 1 and 3 of the Sherman Act.

Envelope# 29328052
Case# 1JC-18-1964

145.     Plaintiffs' claims are typical of the claims of the members of the Class.

146.     Plaintiffs will fairly and adequately assert and protect the interests of the Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Class.

147.     Plaintiffs are represented by counsel competent and experienced in the prosecution of antitrust and class action litigation.

148.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

149.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

a.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

b.     The Class is readily definable and one for which records should exist in the files of Defendants.

c.     Prosecution as a class action will eliminate the possibility of repetitious litigation.

d.     Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

e.     Class treatment will permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this complaint on an individual basis.

74

Envelope# 29328052
Case# 1JC-18-1964

150.     This class action presents no difficulties of management that would preclude its maintenance as a class action.

## X. CAUSE OF ACTION

### Violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3)

151.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

152.     Defendants and their co-conspirators engaged in a continuing contract, combination, and conspiracy to artificially fix, raise, maintain, and/or stabilize the prices of air passenger transportations services for flights within the United States in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) by, *inter alia,* collusively reducing capacity.

153.     Defendants and their co-conspirators agreed to, and did in fact, restrain trade or commerce by fixing, raising, maintaining, and/or stabilizing at artificial and non-competitive levels the prices of air passenger transportations services by, *inter alia,* collusively reducing capacity.

154.     In formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially fix, raise, maintain and/or stabilize air passenger transportations services.

155.     The illegal combination and conspiracy alleged herein had the following effects, among others:

a.     The prices charged by Defendants to, and paid by Plaintiffs and members of the Class for passenger fares were fixed, raised, maintained and/or stabilized at artificially high and non-competitive levels;

75

b.      Plaintiffs and members of the Class have been deprived of free and open competition in the purchase of air passenger transportations services;

c.      Plaintiffs and members of the Class have been required to pay more for air passenger transportations services than they would have paid in a competitive marketplace absent Defendants' price-fixing conspiracy;

d.      Competition in the sale of passenger air transportation has been restrained, suppressed or eliminated.

156.    As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Class have been injured and damaged in their business and property in an amount to be determined according to proof.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray:

A.      That the Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

B.      That the Court adjudge and decree that the contract, combination and conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act;

C.      That the Court enter judgment against Defendants, jointly and severally, in favor of Plaintiffs and the Class;

D.      That the Court award Plaintiffs and the Class treble damages;

E.      That the Court award Plaintiffs and the Class attorneys' fees and costs as well as

76

pre-judgment and post-judgment interest as permitted by law;

      F.     That Defendants and their co-conspirators, their respective successors, assigns,

parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and

employees, and all other persons acting or claiming to act on behalf of Defendants or their co-

conspirators, or in concert with them, be permanently enjoined and restrained from, in any

manner, directly or indirectly, continuing, maintaining or renewing the combination, conspiracy,

agreement, understanding or concert of action, or adopting any practice, plan, program or design

having a similar purpose or affect in restraining competition; and

      G.     That the Court award Plaintiffs and the Class such other and further relief as may

be deemed necessary and appropriate.

Dated: March 25, 2016                        Respectfully submitted,

*/s/ Steven N. Williams*
Steven N. Williams
Adam J. Zapala
Elizabeth Tran
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: 650-697-6000
jcotchett@cpmlegal.com
swilliams@cpmlegal.com
azapala@cpmlegal.com
etran@cpmlegal.com

*/s/ Michael D. Hausfeld*
Michael D. Hausfeld
Hilary K. Scherrer
Jeannine M. Kenney
HAUSFELD, LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
hscherrer@hausfeld.com
mhausfeld@hausfeld.com
jkenney@hausfeld.com

Michael P. Lehmann
Bonny E. Sweeney
HAUSFELD, LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 633-1908
mlehmann@hausfeld.com
bsweeney@hausfeld.com

*Interim Class Counsel*

77

Robert N. Kaplan
Gregory K. Arenson
Elana Katcher
KAPLAN, FOX & KILSHEIMER LLP
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
rkaplan@kaplanfox.com
garenson@kaplanfox.com
ekatcher@kaplanfox.com

Warren T. Burns
Daniel H. Charest
BURNS CHAREST LLP
500 North Akard Street, Suite 2810
Dallas, TX 75201
Telephone: (469) 904-4550
wburns@burnscharest.com
dcharest@burnscharest.com

Elizabeth J. Cabraser
Eric B. Fastiff
Brendan P. Glackin
LIEFF CABRASER HEIMANN &
BERNSTEIN
275 Battery Street, 29th Floor
San Francisco, CA
94111-3339
Telephone: (415) 956-1000
ecabraser@lchb.com
efastiff@lchb.com
bglackin@lchb.com

*Plaintiffs' Executive Committee*

78

Envelope# 29328052
Case# 1JC-18-1964

Filed 11/28/2018 4:28 PM
Judge Dain Johnson
Justice of the Peace, Precinct 1
Williamson County

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| |
|---|
| IN RE DOMESTIC AIRLINE TRAVEL ANTITRUST LITIGATION |
| This Document Relates To: |
| ALL CASES. |

MDL Docket No. 2656
Misc. No. 15-1404 (CKK)

JURY TRIAL DEMANDED

## ORDER PRELIMINARILY APPROVING SETTLEMENT WITH DEFENDANT SOUTHWEST AIRLINES CO.

THIS CAUSE came before the Court on Plaintiffs' Motion for Preliminary Approval of Settlement with Defendant Southwest Airlines Co., filed December 29, 2017. Plaintiffs have entered into a settlement agreement, dated December 20, 2017 with Defendant Southwest Airlines Co. (the "Settlement Agreement"). The Court, having reviewed the Motion, its accompanying memorandum, the Settlement Agreement, and the file, hereby:

**ORDERS AND ADJUDGES:**

1. Terms used in this Order that are defined in the Settlement Agreement are, unless otherwise defined herein, used in this Order as defined in the Settlement Agreement.

<u>Preliminary Approval of Settlement Agreement</u>

2. The Court finds that the Settlement Agreement with Southwest was entered into at arm's-length by highly experienced counsel and is sufficiently fair, reasonable and adequate to authorize dissemination of notice to the Settlement Class defined below and scheduling of the Fairness Hearing described below.

**Exhibit B**

Envelope# 29328052
Case# 1JC-18-1964

<u>Class Certification</u>

3.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure and in light of the

proposed Settlement, the Court hereby finds that the prerequisites for a class action have been

met and certifies the following class for settlement purposes (the "Settlement Class"):

> All persons and entities that purchased air passenger transportation services for
> flights within the United States and its territories and the District of Columbia
> from Defendants or any predecessor, subsidiary or affiliate thereof, at any time
> between July 1, 2011 and December 20, 2017. Excluded from the class are
> governmental entities, Defendants, any parent, subsidiary or affiliate thereof,
> Defendants' officers, directors, employees, and immediate families, and any
> judges or justices assigned to hear any aspect of this action.

4.      The Court finds that the certification of the Settlement Class is warranted in light

of the Settlement Agreement because (a) the Settlement Class is so numerous that joinder is

impracticable; (b) Plaintiffs' claims present common issues and are typical of the Settlement

Class; (c) Plaintiffs and Settlement Class Counsel (defined below) will fairly and adequately

represent the Settlement Class; and (d) common issues predominate over any individual issues

affecting the members of the Settlement Class. The Court further finds that Plaintiffs' interests

are aligned with the interests of all other members of the Settlement Class and settlement of this

action on a class basis is superior to other means of resolving this matter.

<u>Appointment of Settlement Class Counsel and Settlement Class Representatives</u>

5.      The Court hereby appoints Hausfeld LLP and Cotchett Pitre & McCarthy LLP as

Settlement Class Counsel, having determined that the requirements of Rule 23(g) of the Federal

Rules of Civil Procedure are fully satisfied by this appointment.

6.      Plaintiffs Boston Amateur Basketball Club, Katherine Rose Warnock, Cherokii

Verdozco, Kumar Patel, Samantha White, Seth Lyons, Howard-Sloan Koller Group Inc.,

Breanna Jackson, Stephanie Jung, Elizabeth Cumming, and Steven Yeninas will serve as Class

Representatives on behalf of the Settlement Class.

<u>Notice to Potential Class Members</u>

7.      Within 45 days of entry of this Order, Settlement Class Counsel shall submit to

the Court for approval a notice plan for purposes of advising Settlement Class Members, among other things, of their right to object to the Settlement Agreement, of their right to exclude themselves from the Settlement Class, the procedure for submitting a request for exclusion, the time, date, and location of the Fairness Hearing, and their right to appear at the Fairness Hearing.

Other Provisions

11.     In the event that the Settlement Agreement is terminated in accordance with its provisions, the Settlement Agreement and all proceedings had in connection therewith shall be null and void, except insofar as expressly provided to the contrary in the Settlement Agreement, and without prejudice to the status quo ante rights of Plaintiffs, Southwest, and the members of the Settlement Class.

12.     The Court's certification of the Settlement Class as provided herein is without prejudice to or waiver of the rights of any Defendant to contest certification of any other class proposed in these consolidated actions. The Court's findings in this Order shall have no effect on the Court's ruling on any motion to certify any class in this Action and no party may cite or refer to the Court's approval of the Settlement Class as persuasive or binding authority with respect to any motion to certify any such class.

13.     All case deadlines applicable to Southwest, including discovery deadlines, are hereby stayed.

14.     Southwest's obligation to pay its *pro-rata* share of the fees of the Special Master is hereby suspended as of this date.

**IT IS SO ORDERED.**

DATED:  January 3, 2018

COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE